[Nos. A055112, A056217. First Dist., Div. Two. Feb. 4, 1994.]

CALIFORNIA GROCERS ASSOCIATION, INC., Plaintiff and Appellant,
v.
BANK OF AMERICA, NATIONAL TRUST AND SAVINGS
ASSOCIATION, Defendant and Appellant.

**COUNSEL**

Manuel Glenn Abascal, Kathy Shull Abascal and Brad Seligman for Plaintiff and Appellant.

Michael J. Halloran, Winslow Christian, Arne D. Wagner, O'Melveny & Myers, William W. Vaughn, Abigail A. Jones, Robert M. Schwartz and Viola I. Canales for Defendant and Appellant.

Shearman & Sterling, William M. Burke, Richard B. Kendall, Wendy E. Ackerman, Coffield, Ungaretti & Harris, Howard A. Menell, J. Timothy Eaton and Theodore E. Harman as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

## BENSON, Acting P. J.—

### I. INTRODUCTION

In this appeal we decide whether a $3 fee charged by Bank of America for one of its check-processing services is unconscionably high, and if so, whether the trial court erred in issuing an injunction limiting the fee to $1.73, which represents the bank's cost plus a 15 percent markup for profit. We conclude the fee is not unconscionable, and even if it were, that fact could not support affirmative injunctive relief.

### II. BACKGROUND

#### A. *The Prior Class Actions*

The present litigation has its roots in class actions filed in 1977 against Bank of America, Wells Fargo Bank, and Crocker National Bank. In those cases the plaintiffs challenged various fees imposed by the banks for checking and savings account services. Among these were fees charged to the writer of an "NSF" check, that is, a check for which there are not sufficient funds on deposit and fees charged to the depositor of someone else's NSF check. In the language of the banking industry, the latter fee is for a "deposited item returned" or DIR.

After a lengthy period of extraordinarily complex litigation, the class actions were resolved through settlements, which were approved by the San Francisco Superior Court in 1987 and 1988 and were effective for two years. The settlements established various check processing policies and procedures intended to reduce the overall number of future NSF checks and related fees. Limited cash refunds were also provided to customers of Wells Fargo Bank and Crocker National Bank, but not to customers of Bank of America.

Various objectors appealed the orders approving the settlements, contending the settlements were the product of a collusive sellout between class

counsel and the banks. One of the objector-appellants was California Grocers Association, Inc. (CGA), a trade group of 3,500 retail and wholesale grocers whose membership ranges from small independent grocery stores to large chain operations.

We affirmed the orders approving the settlements, primarily on the ground the objectors lacked standing on appeal to assert their challenges to the propriety of the class certification and the fairness of the settlements because they did not suffer the purported harm of which they complained, but asserted it on behalf of others who had not appealed, and thus they were not aggrieved. (*Rebney* v. *Wells Fargo Bank* (1990) 220 Cal.App.3d 1117 [269 Cal.Rptr. 844].) We subsequently affirmed orders allocating attorney fees in the actions. (*Rebney* v. *Wells Fargo Bank* (1991) 232 Cal.App.3d 1344 [284 Cal.Rptr. 113]; *Rudolfi* v. *Bank of America* (July 31, 1991) A051722 [nonpub. opn.].)

## B. *The Present Action*

Following the approval of the settlements in the San Francisco class actions, CGA and one of its member grocers (who had opted out of the Bank of America settlement to the extent it did not include monetary relief) filed the present lawsuit in Alameda County. The action is solely against Bank of America and challenges only the assessment of DIR fees.

The case began as a class action. The court certified the class, but the bank challenged the certification by extraordinary writ petition. In an unpublished decision we ordered the court to vacate the certification order and deny class certification on the ground the plaintiffs were not proper class representatives. (*Bank of America* v. *Superior Court* (May 25, 1990) A046822.)

The action proceeded solely in CGA's name, on behalf of itself and the general public. (See Bus. & Prof. Code, § 17204.) CGA's primary theories were unfair competition (Bus. & Prof. Code, § 17200 et seq.) due to unconscionability of the DIR fee and breach of the implied covenant of good faith and fair dealing.

## C. *The DIR Fee*

Bank of America's DIR procedures and the DIR fee are described in pamphlets setting forth the terms and conditions to which a customer agrees when opening a business or personal deposit account. The pamphlets state: "If a check or other item you deposit to your account is returned to us for any reason, we charge your account for the amount of the item plus any

interest you earned on the item. If a check or other item we cash for you is returned to us for any reason, we charge your account for the amount of the item. We also charge you $3 for each returned item and notify you that the item was returned."

Most DIR's result from lack of sufficient funds in the check writer's account. However, they are also caused by other factors such as a stop payment order or closure of the account.

There are two types of DIR's, "on-us" and "transit." An on-us DIR is a check that is written and deposited by customers of the same bank. A transit DIR is a check that is written and deposited by customers of different banks. Approximately 30 percent of Bank of America's DIR's are on-us; the rest are transit. CGA contends not only that a $3 DIR fee is excessive, but that no fee at all should be permitted for an on-us DIR because its cost is covered by the fee the bank charges to the writer of the NSF check.

The majority of DIR fees are imposed on high-volume depositors such as government entities, utility companies and merchants. Grocers are a major source of these fees, as consumers often pay for groceries by personal check. Most customers pay Bank of America's full $3 DIR fee. A few of the largest retailers, however, have negotiated DIR fees as low as $1.50.

Some other financial institutions in California charge more than Bank of America for DIR's, as much as $4 or $5 at some major banks and up to $10 at a few institutions. Fees under $3, however, are charged at only one smaller bank ($2.50) and two credit unions ($2).

Bank of America's total number of DIR's is huge. In 1991 the bank processed approximately 200 million checks per month. Of these, the bank claims some 584,000 were DIR's. The true number of monthly DIR's is possibly much higher; it is generally accepted in the banking industry that about 1 percent of deposited checks become DIR's. Yearly DIR fees may well exceed $20 million.

### D. *The Judgment*

After a nonjury trial, the court rendered judgment for CGA, ruling as follows: The specification of the $3 DIR fee in the pamphlets setting forth the terms and conditions of the deposit agreement is adhesive in nature, except as to some large businesses that can negotiate lower fees. The bank's overall current profit margin is 15 percent, which is generally consistent with the banking industry. The bank's cost of processing a DIR is approximately

$1.50. The sum of this cost plus a 15 percent markup for profit is $1.73, which is a reasonable fee. The extent to which the bank's $3 fee exceeds $1.73, a 73 percent additional markup is unconscionably high and a violation of the covenant of good faith and fair dealing, and thus is an unfair business practice under Business and Professions Code section 17200.

The court also ruled it is lawful for the bank to charge a fee for on-us DIR's.

The court declined to award restitution exceeding nominal damages of $1 to CGA. Instead, noting that the bank had been overcharging for at least 10 years, the court issued an injunction requiring Bank of America to lower its DIR fee to not more than $1.73 for a 10-year period ending July 31, 2001. The injunction is subject to modification upon a showing of good cause by any affected party at any time during the 10-year period. The court expressly stayed enforcement of the injunction during the pendency of an appeal. (See *Agricultural Labor Relations Bd.* v. *Superior Court* (1983) 149 Cal.App.3d 709, 716-717 [196 Cal.Rptr. 920] [mandatory injunction is automatically stayed by appeal].) However, the court reserved jurisdiction to award restitution of excessive charges imposed after the rendition of judgment.

Bank of America filed a timely appeal from the judgment, and CGA filed a timely cross-appeal.

### E. *The Attorney Fee Award*

In postjudgment proceedings, the court awarded attorney fees of $2,000,605, plus costs of $53,227, to CGA's counsel pursuant to Code of Civil Procedure section 1021.5, commonly known as the private attorney general statute. The court employed a multiplier of two for work on the merits of the case, based on the finding that the case "involved a significant public benefit resulting in the saving of tens of millions of dollars to consumers, . . . involved contingent risks and required substantial attorney's skill."

Bank of America filed a timely appeal from the fee order. The appeals from the judgment and the fee order have been consolidated.

### III. DISCUSSION

### A. *Bank of America's Appeal From the Judgment*

In its appeal from the judgment, Bank of America challenges the findings of unconscionability and breach of the implied covenant of good faith and fair dealing, as well as the propriety of the injunctive relief granted.

## 1. *Unconscionability*

We begin with an overview of unconscionability, which is the cornerstone of the judgment.

The doctrine of unconscionability, that a court can refuse to enforce an unconscionable provision in a contract, is codified by Civil Code section 1670.5. The statute provides in pertinent part: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." (Civ. Code, § 1670.5, subd. (a); see generally Rest.2d Contracts, § 208; U. Com. Code, § 2-302.)

Unconscionability operates as a defense to enforcement of a contract of adhesion: In *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 820 [171 Cal.Rptr. 604, 623 P.2d 165], the California Supreme Court explained: "Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him. [Citations.] The second, a principle of equity applicable to all contracts generally is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.' "

### a. *The appropriate mode of analysis*

In *A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473 [186 Cal.Rptr. 114, 38 A.L.R.4th 1], the court approached the question of unconscionability somewhat differently from the approach in *Graham* v. *Scissor-Tail, Inc.* The court in *A & M Produce* divided its analysis of unconscionability into "procedural" and "substantive" elements: "Procedural" unconscionability may result from "oppression" (an inequality of bargaining power curtailing real negotiation and an absence of meaningful choice) or "surprise" (the assertion of hidden and unexpected contractual provisions). A contract is "substantively" unconscionable if it is one-sided, is unreasonable, and lacks justification. (*A & M. Produce Co.* v. *FMC Corp., supra*, 135 Cal.App.3d at pp. 485-487; see *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 925, fn. 9 [216 Cal.Rptr. 345, 702 P.2d 503].)

The California Supreme Court harmonized these two approaches in *Perdue* v. *Crocker National Bank, supra*, 38 Cal.3d at page 925, footnote 9. The

court said, "*Graham* v. *Scissor- Tail, Inc.* comports somewhat more closely to the California precedent; *A & M Produce* conforms more closely to the Uniform Commercial Code and the cases decided under that code. Both pathways should lead to the same result."

Our preference is for the pathway taken in *Graham* v. *Scissor-Tail, Inc.* The notion of "procedural" unconscionability merely addresses the question whether a contract is adhesive. In cases of the present sort, adhesiveness is not the central issue. "To describe a contract as adhesive in character is not to indicate its legal effect. It is, rather, 'the beginning and not the end of the analysis insofar as enforceability of its terms is concerned.' " (*Graham* v. *Scissor-Tail, Inc., supra*, 28 Cal.3d at p. 819, quoting *Wheeler* v. *St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 357 [133 Cal.Rptr. 775, 84 A.L.R.3d 343].) The central issue is whether the adhesive contract is unduly oppressive or unconscionable. (*Graham* v. *Scissor-Tail, Inc., supra*, 28 Cal.3d at p. 820.) To speak in terms of "procedural" unconscionability is to elevate the fact of adhesiveness, which is not per se oppressive, to the same level as "substantive" unconscionability, thus tending to obscure the real issue.

### b. *The proper standard of unconscionability*

We also decline to follow *A & M Produce* to the extent it may be construed as making "reasonableness" the standard of unconscionability. (See *A & M Produce Co.* v. *FMC Corp., supra*, 135 Cal.App.3d at p. 487.) Such an amorphous standard is far too subjective to provide adequate guidance.

The traditional standard of unconscionability, as set forth in *Osgood* v. *Franklin* (1816 N.Y. Ch.) I Johns. Ch. 1, 21, is that ". . . the inequality amounting to fraud must be so strong and manifest as to *shock the conscience* and confound the judgment of any man of common sense." (Italics added.) Subsequent decisions have defined an unconscionable contract in varying but similar terms, such as a contract that "[n]o man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other" (*Bennett* v. *Behring Corp.* (S.D.Fla. 1979) 466 F.Supp. 689, 695, quoting *Hume* v. *United States* (1889) 132 U.S. 406 [33 L.Ed. 393, 10 S.Ct. 134]), or one where ". . . the terms are 'so extreme as to appear unconscionable according to the mores and business practices of the time and place' " (*Williams* v. *Walker-Thomas Furniture Company* (D.C.Cir. 1965) 350 F.2d 445, 450 [121 App.D.C. 315, 18 A.L.R.3d 1297], quoting 1 Corbin, Contracts (1963) § 128), or one where there is "gross overpricing" (*Patterson* v. *Walker-Thomas Furniture Co.* (App.D.C. 1971)

277 A.2d 111, 113), or one that is "overly harsh" (*Carboni* v. *Arrospide* (1991) 2 Cal.App.4th 76, 83 [2 Cal.Rptr.2d 845]).

These formulations are more specific, more exacting, and more demanding than an "unreasonableness" standard, and are thus preferable. And language such as "so extreme," "gross overpricing," and "overly harsh" leads inevitably back to the original "shock the conscience" standard, which, after all, is merely derivative of the term "unconscionable." In analyzing Bank of America's $3 DIR fee for unconscionability, we perceive the pivotal issue to be whether the fee shocks the conscience.

c. *Application to this case*

Applying the above principles to the present case, the preliminary question is whether we have a contract of adhesion. The answer is yes. A bank depositor's signature card, stating that the account is subject to the bank's rules, regulations, practices and charges, is a contract. (*Perdue* v. *Crocker National Bank, supra*, 38 Cal.3d at pp. 921-922.) Bank of America's "Bank-Depositor Agreement," which is signed by a depositor when opening an account, includes an agreement that the bank "will handle my deposits according to your arrangements for services of this type," and "[t]he publication which you give me as part of this agreement tells me how these services now work." This "publication" is the pamphlet setting forth the terms and conditions of the deposit agreement. Under *Perdue*, the Bank-Depositor Agreement is a contract, and the $3 DIR fee set forth in the incorporated pamphlet is a provision of that contract. In the formation of the deposit agreement, the bank is in a position of superior bargaining strength, and the depositor's only choice is to adhere to the deposit agreement or reject it. The deposit agreement is thus "a classic example of a contract of adhesion," since it is "drafted by the bank and offered to the customer without negotiation." (*Id.* at p. 925.)

The adhesive nature of the contract, however, merely brings us to the pivotal question, whether the $3 fee is so high as to shock the conscience i.e., whether the fee is unconscionable. We conclude it is not.

We reach this conclusion for two reasons. First, Bank of America's $3 DIR fee is actually at the *low end* of prices charged for DIR's by other financial institutions, many of which charge between $4 and $10. When a price is claimed to be unconscionable, one of the factors to be considered is " 'the price actually being paid by . . . other similarly situated consumers in a similar transaction.' " (*Perdue* v. *Crocker National Bank, supra*, 38 Cal.3d at p. 927, quoting *Bennett* v. *Behring Corp., supra*, 466 F.Supp. at p. 697.)

We recognize that a price within the range of general market prices may still be held unconscionable if the market is oligopolistic. "While it is unlikely that a court would find a price set by a freely competitive market to be unconscionable [citation], the market price set by an oligopoly should not be immune from scrutiny." (*Perdue* v. *Crocker National Bank, supra,* 38 Cal.3d at p. 927.) But the present record does not establish that the banking industry in California is oligopolistic. ■ An oligopoly is "a market structure in which a few sellers dominate the sales of a product and where entry of new sellers is difficult or impossible. . . . [¶] Oligopolistic markets are characterized by high market concentration. Usually the four largest producers of a good account for over half the domestic shipments." (Hyman, Economics (2d ed. 1992) p. 356.) ■ Here, the record merely indicates that in the 1980's Bank of America handled about one-third of the checking business in California and had four major competitors. The record does not reveal the market share of the major competitors or whether entry of new "sellers" was difficult or impossible. Indeed, one of Bank of America's experts testified without contradiction that the California banking industry (which in 1989 included 665 banks and about 1,000 credit unions) is highly competitive. One court has observed, "Banks in our society are commonly most competitive." (*Copesky* v. *Superior Court* (1991) 229 Cal.App.3d 678, 691 [280 Cal.Rptr. 338].) Absent a showing of oligopoly and consequent lack of free competition, we cannot discount the significance of the fact the $3 fee is at the low end of fees charged by other institutions.

Second, and more fundamentally, the $3 fee simply is not so exorbitant as to shock the conscience. The trial court determined that Bank of America's cost of processing a DIR is approximately $1.50. The bank argues its true cost is higher, but even assuming a cost of $1.50, the markup is only 100 percent. This may be a generous profit, but it is wholly within the range of commonly accepted notions of fair profitability. Cases of price unconscionability generally involve much greater price-value disparities. (E.g., *Perdue* v. *Crocker National Bank, supra,* 38 Cal.3d at p. 928 [profit estimates of 600 and 2,000 percent for NSF fee "indicate the need for further inquiry"]; *Carboni* v. *Arrospide, supra,* 2 Cal.App.4th at pp. 83-84 [interest rate approximately 10 times the prevailing rate]; *Jones* v. *Star Credit Corp.* (1969) 59 Misc.2d 189 [298 N.Y.S.2d 264] [sale of freezer at triple its retail value].)

The huge volume of DIR's, and the consequent cumulative profit to Bank of America, is inconsequential. ■ "A contract, fair when entered into, does not thereafter become unconscionable simply because a great many other persons enter into identical contracts with defendant thereby increasing

defendants' profits." (*Bennett* v. *Behring Corp., supra,* 466 F.Supp. at p. 698.)

■ We hold the doctrine of unconscionability does not support the trial court's determination that Bank of America's imposition of a DIR fee in the sum of $3 is an unfair business practice under Business and Professions Code section 17200.

### 2. *The Implied Covenant*

■ As an alternative basis for the judgment, the trial court concluded the $3 fee violates the implied covenant of good faith and fair dealing. This was error in light of the rule that an implied contractual term (here, the implied covenant) should not be read to vary an express term (here, the specification of the $3 fee in the deposit agreement). (See *Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 [6 Cal.Rptr.2d 467, 826 P.2d 710].)

### 3. *The Injunctive Relief*

■ We also perceive a separate and independent basis for reversal. The trial court issued an injunction requiring the bank to lower its DIR fee to not more than $1.73 for 10 years. Such relief is an inappropriate exercise of judicial authority.

The doctrine of unconscionability has historically provided only a defense to enforcement of a contract, and normally cannot be used offensively to obtain mandatory injunctive relief. As embodied in Civil Code section 1670.5, the doctrine is phrased in defensive terms: a court "may refuse to enforce" an unconscionable contract or "may enforce the remainder" of a contract without an unconscionable clause. (Civ. Code, § 1670.5, subd. (a).) The statute does not in itself create an affirmative cause of action but merely codifies the defense of unconscionability. (*Dean Witter Reynolds, Inc.* v. *Superior Court* (1989) 211 Cal.App.3d 758, 766 [259 Cal.Rptr. 789].)

An affirmative cause of action for unconscionability may be provided by statute. This has occurred in the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.), which expressly permits a consumer to bring an action for damages and injunctive relief based on insertion of an unconscionable provision in a contract. (Civ. Code, §§ 1770, subd. (s), 1780, subd. (a); *Truta* v. *Avis Rent A Car System, Inc.* (1987) 193 Cal.App.3d 802, 818 [238 Cal.Rptr. 806].) But the Consumers Legal Remedies Act does not apply here because CGA is not a consumer of "services for personal, family, or household purposes" (Civ. Code, § 1761, subd. (d)).

The statutory law of unfair competition (Bus. & Prof. Code, § 17200 et seq.), on which the present judgment is based, includes no similar express authorization of an affirmative cause of action for unconscionability. The law does, however, generally prohibit an "unfair" business practice (Bus. & Prof. Code, § 17200), which "may be enjoined in any court of competent jurisdiction" (Bus. & Prof. Code, § 17203). Does this encompass an affirmative cause of action for unconscionability? We need not decide. Assuming the answer is yes, as is suggested by the Legislature's broad grant of remedial power (see *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 210 [197 Cal.Rptr. 783, 673 P.2d 660]; *Consumers Union of U.S., Inc.* v. *Alta-Dena Certified Dairy* (1992) 4 Cal.App.4th 963, 972 [6 Cal.Rptr.2d 193]; cf. *Shadoan* v. *World Savings & Loan Assn.* (1990) 219 Cal.App.3d 97, 106 [268 Cal.Rptr. 207] [combination of loan provisions "is not unconscionable, and thus not an unfair business practice"]), the authority to grant injunctive relief is still discretionary, and we conclude that the court in the present case abused such discretion.

Judicial review of one service fee charged by one bank is an entirely inappropriate method of overseeing bank service fees. This point was recognized by the trial judge in *Beasley* v. *Wells Fargo Bank* (1991) 235 Cal.App.3d 1383, 1391 [1 Cal.Rptr.2d 446], who awarded damages for overcharges on bank credit card fees but declined to grant injunctive relief, stating he did not believe the court was " '. . . well suited to regulating retail bank pricing via injunction on an ongoing basis.' " Another court, in a different context, pointed out the general preference for legislative or administrative regulation in the field of price control: "[T]he control of charges, if it be desirable, is better accomplished by statute or by regulation authorized by statute than by *ad hoc* decisions of the courts. Legislative committees and an administrative officer charged with regulating an industry have better sources of gathering information and assessing its value than do courts in isolated cases." (*Lazzareschi Inv. Co.* v. *San Francisco Fed. Sav. & Loan Assn.* (1971) 22 Cal.App.3d 303, 311 [99 Cal.Rptr. 417].)

This case implicates a question of economic policy: whether service fees charged by banks are too high and should be regulated. "It is primarily a legislative and not a judicial function to determine economic policy." (*Max Factor & Co.* v. *Kunsman* (1936) 5 Cal.2d 446, 455-456 [55 P.2d 177].) We agree with *Jacobs* v. *Citibank, N.A.* (1984) 61 N.Y.2d 869, 871-872 [474 N.Y.S.2d 464, 465, 462 N.E.2d 1182], a case involving NSF fees, which concluded, "To grant the relief requested by plaintiffs would be to impose a limit on the amount Federally chartered banks can charge for processing overdrafts. This is a task more properly left to the Comptroller of the

currency who has decided that '[a]ll charges to customers should be arrived at by each bank on a competitive basis'. (12 CFR 7.8000[a].)"

### B. *CGA's Cross-appeal From the Judgment*

■ In its cross-appeal from the judgment, CGA challenges the trial court's ruling that it is lawful for Bank of America to charge a fee for on-us DIR's. CGA argues such a fee is an unfair business practice (Bus. & Prof. Code, § 17200) because the DIR service for on-us DIR's is encompassed by the NSF fee charged to the check writer and thus cannot constitute consideration for another fee charged to the depositor.

There is general support in the California case law for the proposition that consideration cannot consist of the promise to perform a preexisting duty owed to a third person. (E.g., *Ellison* v. *Jackson Water Company* (1859) 12 Cal. 542, 553; *Bailey* v. *Breetwor* (1962) 206 Cal.App.2d 287, 292 [23 Cal.Rptr. 740] ["a promise by one to fulfill his own contract with another is no consideration for a promise by a third party"].) It is also arguable, however, that there may be consideration in such circumstances because ". . . although the party previously bound suffers *no detriment*, the other party receives a *benefit*—the right to enforce the duty . . . ." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 222, p. 229, original italics.)

But even assuming the law favors CGA, the facts do not. The record contains substantial evidence that the DIR service for on-us DIR's is *not* encompassed by the NSF fee.

Witnesses described NSF and DIR procedures as follows: All checks deposited with Bank of America, transit and on-us, go to an "items processing operation" (IPO) center in San Francisco or Los Angeles. Transit checks are then forwarded to the check writers' banks, and those checks rejected by the transit banks are returned to Bank of America, where they proceed to the "returned items processing" section of the IPO center. On-us checks remain with Bank of America; those lacking sufficient funds are subjected to a decision by the check writer's local branch whether they should nevertheless be paid, and the nonpaid checks, like transit DIR's, proceed to the returned items processing section. At this point the DIR process begins, and it is the same for transit and on-us checks: various clerical and accounting functions are performed, and the check is returned to the depositor along with an "advice" of the DIR.

Bank of America characterizes the returned items processing section as a dividing line between NSF services and DIR services. The trial court

accepted this characterization. It is supported by the testimony of the witnesses. This forecloses CGA's argument that the NSF fee for on-us checks encompasses DIR services.

CGA argues that under the terms of the check writer's deposit agreement the NSF fee pays for the return of an on-us NSF check to the depositor: such return is prescribed by the agreement's provision that the bank will "either return the insufficient funds item or pay it and overdraw your account," and by statute the "return" of an on-us check occurs "when it is sent or delivered to the bank's customer or transferor . . . ." (Cal. U. Com. Code, § 4301, subd. (d)(2).) The trial judge rejected this argument, concluding that "the bank's return of the check to the depositor is hardly the consideration the checkwriter bargains for. Who gets the check is a matter of indifference to the checkwriter." We agree. The service provided to the check writer in exchange for the NSF fee consists of NSF processing functions performed on the check writer's behalf, such as the decision whether to pay the NSF item. The return of the check to the depositor is of no consequence to the check writer, and thus cannot reasonably be considered part of the check writer's bargain with the bank.

CGA also claims the procedures for processing on-us DIR's, which generate two fees for Bank of America, are identical to the procedures for processing transit DIR's, which generate only one fee for the bank. Not so. With on-us DIR's, Bank of America engages in the process of deciding whether to pay or reject a bad check. With transit DIR's, Bank of America does not perform this task; rather, it is performed by the transit bank. This is what Bank of America calls an NSF service. Its performance by Bank of America for on-us DIR's justifies the charge of an NSF fee to the check writer and a separate DIR fee to the depositor.

In short, the bank's provision of DIR services is not a preexisting duty under the check writer's agreement to pay NSF fees, and thus constitutes consideration for the DIR fee regardless of the status of the law on preexisting duty.

### C.   *Bank of America's Appeal From the Attorney Fees Order*

Because we must reverse the judgment to the extent CGA prevailed, we must also reverse the order awarding attorney fees and costs to CGA's counsel under Code of Civil Procedure section 1021.5. An order awarding such fees "falls with a reversal of the judgment on which it is based." (*Merced County Taxpayers' Assn.* v. *Cardella* (1990) 218 Cal.App.3d 396, 402 [267 Cal.Rptr. 62].)

## IV. DISPOSITION

The judgment is affirmed to the extent it concludes Bank of America's fee for on-us DIR's is lawful, and in all other respects is reversed. The order awarding attorney fees is reversed. The parties shall bear their own costs on appeal.

Phelan, J., and Dossee, J.,* concurred.

A petition for a rehearing was denied March 2, 1994, and the petition of appellant California Grocers Association, Inc., for review by the Supreme Court was denied June 9, 1994. Lucas, C. J., Mosk, J., and Baxter, J., did not paticipate therein.

---

*Associate Justice of the Court of Appeal First District, Division One, sitting under assignment by the Chairperson of the Judicial Council.