[No. E026961. Fourth Dist., Div. Two. Nov. 30, 2001.]

DESERT HEALTHCARE DISTRICT, Plaintiff and Appellant, v. PACIFICARE, FHP, INC., Defendant and Respondent.

782

784

**COUNSEL**

Ralph Helton & Associates, Ralph G. Helton and Carrie S. McLain for Plaintiff and Appellant.

Konowiecki & Rank, Thomas C. Knego; Greines, Martin, Stein & Richland, Timothy T. Coates and Alan Diamond for Defendant and Respondent.

## OPINION

**RAMIREZ, P. J.**—Desert Healthcare District (Desert Healthcare) appeals from an order dismissing its second amended complaint following an order sustaining the demurrer of PacifiCare, FHP, Inc. (PacifiCare). Desert Healthcare alleges that PacifiCare (1) violated Health and Safety Code section 1371 of the Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act) (Health & Saf. Code, § 1340 et seq.);[1] (2) acted negligently; and (3) violated the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.). We find no merit to Desert Healthcare's claims and affirm.

### STATEMENT OF FACTS

Desert Healthcare is the owner of a hospital in Palm Springs. PacifiCare is a health care service plan licensed to do business under the Knox-Keene Act. PacifiCare contracted with Desert Physicians Association (DPA) to provide medical services to PacifiCare's subscribers. Although the complaint failed to fully describe the PacifiCare/DPA contract, the demurrer and response adequately clarified that it was a capitation agreement, i.e., PacifiCare paid DPA a flat fee per person to provide physicians and obtain hospital services for PacifiCare's subscribers. DPA subsequently contracted with Desert Healthcare to obtain hospital services for PacifiCare's subscribers. At a time when Desert Healthcare was owed millions of dollars for services provided to PacifiCare's subscribers under the contract with DPA, DPA filed for bankruptcy and thereby extinguished its debts. As a result, Desert Healthcare filed this action against PacifiCare to recover payment for the services it provided to PacifiCare's subscribers under the contract with DPA.

In its second amended complaint, Desert Healthcare detailed several causes of action. First, Desert Healthcare asserted that PacifiCare violated section 1371 of the Knox-Keene Act, which allegedly obligated PacifiCare to pay all claims despite the contract with DPA. Next, Desert Healthcare alleged various forms of negligence, including (1) negligent failure to ensure the financial stability of DPA; (2) per se negligence for violating section 1371; and (3) negligence arising from the special relationship between Desert Healthcare and PacifiCare. Lastly, Desert Healthcare raised an unfair competition claim under the UCL based on PacifiCare's practice of requiring

---

[1]All further statutory references will be to the Health and Safety Code unless otherwise indicated.

waivers from its providers and refusing to pay claims for which it had received premiums.[2]

The trial court sustained PacifiCare's demurrer to the second amended complaint without leave to amend. The trial court rejected the causes of action based on section 1371, holding that health care service plans are not required to be financially responsible for the obligations of intermediaries, such as DPA. The trial court similarly rejected the negligence causes of action, holding that PacifiCare had no duty to ensure the financial stability of its intermediaries. Additionally, the trial court rejected the UCL claim, holding that (1) the Department of Corporations is exclusively responsible for regulating health care service plans; (2) the Legislature and the Department of Corporations expressly permit capitation contracts; and (3) Desert Healthcare otherwise failed to allege any unlawful, unfair, or fraudulent conduct that would have violated the UCL.

## DISCUSSION

### 1. *Demurrer Standards*

■ "The rules by which the sufficiency of a complaint is tested against a general demurrer are well settled. We not only treat the demurrer as admitting all material facts properly pleaded, but also 'give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]' [Citation.] [¶] If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer. '[W]e are not limited to plaintiffs' theory of recovery in testing the sufficiency of their complaint against a demurrer, but instead must determine if the factual allegations of the complaint are adequate to state a cause of action under any legal theory. . . .' [Citations.]" (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38-39 [77 Cal.Rptr.2d 709, 960 P.2d 513] (*Quelimane*), italics omitted.)

### 2. *Section 1371 of the Knox-Keene Act*

■ Desert Healthcare primarily argues that section 1371 of the Knox-Keene Act requires PacifiCare to bear the ultimate responsibility for the payment of claims despite its capitation agreement with DPA. At the time this action was instituted, section 1371 provided in full: "A health care service plan, including a specialized health care service plan, shall reimburse

---

[2]Desert Healthcare's complaint also contained various contractual claims which have been abandoned on appeal.

claims or any portion of any claim, whether in state or out of state, as soon as practical, but no later than 30 working days after receipt of the claim by the health care service plan, or if the health care service plan is a health maintenance organization, 45 working days after receipt of the claim by the health care service plan, unless the claim or portion thereof is contested by the plan in which case the claimant shall be notified, in writing, that the claim is contested or denied, within 30 working days after receipt of the claim by the health care service plan, or if the health care service plan is a health maintenance organization, 45 working days after receipt of the claim by the health care service plan. The notice that a claim is being contested shall identify the portion of the claim that is contested and the specific reasons for contesting the claim.

"If an uncontested claim is not reimbursed by delivery to the claimants' address of record within the respective 30 or 45 working days after receipt, interest shall accrue at the rate of 10 percent per annum beginning with the first calendar day after the 30- or 45-working-day period.

"For the purposes of this section, a claim, or portion thereof, is reasonably contested where the plan has not received the completed claim and all information necessary to determine payer liability for the claim, or has not been granted reasonable access to information concerning provider services. Information necessary to determine payer liability for the claim includes, but is not limited to, reports of investigations concerning fraud and misrepresentation, and necessary consents, releases, and assignments, a claim on appeal, or other information necessary for the plan to determine the medical necessity for the health care services provided.

"If a claim or portion thereof is contested on the basis that the plan has not received all information necessary to determine payer liability for the claim or portion thereof and notice has been provided pursuant to this section, then the plan shall have 30 working days or, if the health care service plan is a health maintenance organization, 45 working days after receipt of this additional information to complete reconsideration of the claim.

"*The obligation of the plan to comply with this section shall not be deemed to be waived when the plan requires its medical groups, independent practice associations, or other contracting entities to pay claims for covered services.*" (Italics added.)

Desert Healthcare argues that according to the plain language of the last paragraph (the nonwaiver clause), health care service plans remain obligated to pay claims regardless of their capitation agreements. Desert Healthcare

reasons that "[i]t would seem self-evident that a health care service plan cannot be ultimately responsible for *prompt* payment of covered claims without being ultimately responsible for payment of covered claims in the first place."

■ "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language 'in isolation.' [Citation.] Rather, we look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.] We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' [Citations.]" (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129]; see also *Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063 [103 Cal.Rptr.2d 751, 16 P.3d 166].)

■ Desert Healthcare's interpretation of section 1371 is somewhat persuasive. The detailed claims processing procedures, mandated by section 1371, are expressly made applicable only to health care service plans. It seems difficult for a plan to comply with these procedures if someone else is paying the claim. This conclusion is reinforced by a subsequent amendment to section 1371 which added a requirement that "[a] health care service plan shall automatically include in its payment of the claim all interest that has accrued pursuant to this section without requiring the claimant to submit a request for the interest amount." (Stats. 2000, ch. 825, § 3.) Again, it seems difficult for a plan to automatically include interest if someone else is paying the claim.

Nevertheless, although the nonwaiver clause is phrased in a way that sounds suspiciously like a nondelegation clause, it is not. Quite to the contrary, the nonwaiver clause presumes that plans can delegate their payment obligations; it provides that even when the payment obligation is delegated, the time limits and other procedural mechanisms still must be satisfied. Thus, when read in isolation, the nonwaiver clause is not properly susceptible to the interpretation proposed by Desert Healthcare.

When read as a whole, section 1371 also fails to support Desert Healthcare's interpretation. Section 1371 merely imposes certain procedural requirements on the processing of claims; it does not create a new, independent basis for liability. Again, the statute presumes that there is a legitimate

contractual basis for liability, and merely creates a procedural framework for the satisfaction of those presumed contractual obligations.

Furthermore, Desert Healthcare's interpretation of section 1371 conflicts with other portions of the Knox-Keene Act by effectively destroying capitation contracts. If section 1371 required plans to pay all claims regardless of their contractual arrangements, then capitation contracts, where payment is on a per person as opposed to a per service basis, would be illusory. Even when the plan paid the appropriate capitation rate, it would still be liable to pay for the health care services actually used.

Such a result directly conflicts with other portions of the Knox-Keene Act that specifically approve of capitation contracts. In 1996, the same Legislature that added the nonwaiver clause to section 1371 enacted section 1348.6. Section 1348.6, subdivision (a) prohibits "any incentive plan that includes specific payments made directly . . . to a physician, physician group, or other licensed health care practitioner as an inducement to deny, reduce, limit, or delay specific, medically necessary, and appropriate services provided with respect to a specific enrollee or groups of enrollees with similar medical conditions." However, subdivision (b) exempts risk-sharing arrangements, such as capitation contracts: "Nothing in this section shall be construed to prohibit contracts that contain incentive plans that involve general payments, such as capitation payments, or shared-risk arrangements that are not tied to specific medical decisions involving specific enrollees or groups of enrollees with similar medical conditions." Thus, contrary to Desert Healthcare's interpretation of section 1371, the Legislature has specifically approved of capitation contracts and other risk-sharing arrangements.

Additionally, the Legislature recently modified and added certain sections to the Knox-Keene Act in order to strictly regulate risk-sharing arrangements. For instance, effective January 1, 2000, the Legislature declared a temporary moratorium on contracts "for the assumption of financial risk with respect to the provision of both institutional and noninstitutional health care services and any other form of global capitation." (§ 1349.3, subd. (a); see also §§ 1367.36 [regulating risk-based contracts for the provision of immunizations for children], 1375.4 [regulating risk-bearing organizations], 1375.5, 1375.6 [limiting risk-sharing contracts].) These subsequent attempts to monitor the financial solvency of risk-bearing organizations would have been unnecessary under Desert Healthcare's interpretation of section 1371.[3]

■ Even if we found the statutory language to be ambiguous, we would next "resort to extrinsic sources, including the ostensible objects to be

---

[3]Sections 1375.4, 1375.5, and 1375.6 were added in 1999 by Senate Bill No. 260 (Stats. 1999, ch. 529, §§ 3, 4 & 5) to provide for "the regulation of risk-bearing provider organizations to help ensure the financial solvency of medical groups and continuity of care for

achieved and the legislative history." (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) In doing so, we " ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citations.]" (*Ibid.*)

 The nonwaiver clause of section 1371 was added in 1996 by Senate Bill No. 1478 (1995-1996 Reg. Sess.), Statutes, chapter 711, section 1. Originally, Senate Bill No. 1478 had nothing to do with time limits for the payment of claims. However, it was subsequently amended to make section 1371 applicable "to medical groups, independent practice associations, contracting entities of health care service plans, medical groups, and independent practice associations." (Assem. Amend. to Sen. Bill No. 1478 (1995-1996 Reg. Sess.) June 19, 1996.) The sponsor asserted that "physicians have reported difficulties obtaining timely payment from the medical groups or IPAs [independent practice associations] with whom they contract." (Assem. Com. on Insurance, Analysis of Sen. Bill No. 1478 (1995-1996 Reg. Sess.) June 19, 1996, p. 2.) Thus, "this bill is necessary because the current law that requires insurers and plans to pay claims within 30 days does not apply to medical groups and IPAs; and thus, they have no obligation nor motivation to comply with the 30-day reimbursement requirement." (Assem. Com. on Health, Analysis of Sen. Bill No. 1478 (1995-1996 Reg. Sess.) June 19, 1996, p. 2.) The amendment accomplished this task by adding the phrase "medical group, independent practice association, or their contracting entities" after every reference to health care service plans, thus making section 1371 directly applicable to medical groups and independent practice associations. (Assem. Amend. to Sen. Bill No. 1478 (1995-1996 Reg. Sess.) June 19, 1996.)

The Assembly Committee on Health noted, however, that this amendment may have two unintended consequences: (1) it incorrectly implies that a plan is no longer liable for compliance with the time limits if it delegates payment responsibilities to another entity; and (2) it extends regulatory jurisdiction over entities that are not otherwise subject to regulation under the Knox-Keene Act. (Assem. Com. on Health, Analysis of Sen. Bill No. 1478 (1995-1996 Reg. Sess.) June 19, 1996, p. 2.) The Health Committee recommended changing the language to read: "The obligations of the plan, pursuant to this section, cannot be deemed to be waived when the plan contracts

patients." (Senate Com. on Health, 3d reading analysis of Sen. Bill No. 260 (1999-2000 Reg. Sess.) as amended Sept. 8, 1999.) Thus, the Legislature appears to have recognized and attempted to rectify the evils complained of by Desert Healthcare. Unfortunately for Desert Healthcare, the changes come too late.

with a medical group, independent practice association, or other contracting entity to provide medical services." (*Id.* at p. 3.) It claimed that "[t]his language would fulfill the purpose of the bill without the unintended ramifications described above." (*Ibid.*) The health committee's recommendations were ultimately adopted with minor linguistic modifications, resulting in the current nonwaiver clause.

This legislative history reveals that the nonwaiver clause was merely intended to require contracting entities, such as independent practice associations, to comply with the procedures for handling claims set forth in section 1371. The language initially used to accomplish this task, explicitly including contracting entities within section 1371, did not in any way allow for the sort of argument raised by Desert Healthcare. The ambiguity exploited by Desert Healthcare only arose when the Legislature attempted to avoid the direct approach by indirectly reaching contracting entities through the health care service plans that employ them. By holding the plans responsible for the failures of their contracting entities, it was hoped that the plans would be motivated to actively police their contracting entities. In this way, the amendment's purpose would be served (the contracting entities would be required to comply with § 1371) without the need to extend Knox-Keene Act jurisdiction to previously unregulated entities.[4]

In conclusion, although the language that was ultimately used may have been ill-advised, the intent of the Legislature in enacting section 1371 is clear: to motivate health care service plans to require their contracting entities to comply with section 1371 by subjecting the plans to disciplinary action and penalties for the failures of contracting entities. The nonwaiver clause was never intended to create an independent basis for liability.[5]

3. *Negligence*

■ Desert Healthcare essentially argues that PacifiCare breached its duty to ensure the financial stability of DPA. We disagree, concluding that there is no such duty.

■ "The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion. [Citation.] Whether this essential prerequisite to a negligence cause of action has been satisfied in a

---

[4]For similar reasons, the Department of Corporations denied a request for a regulation to make plans the primary obligor for payment of claims notwithstanding contractual provisions to the contrary. (Dept. of Corp., denial on petn. by Cal. Medical Assn. to adopt Cal. Code Regs., tit. 10, § 1300.75, Dec. 29, 1998.)

[5]Of course, in order to avoid penalties and disciplinary action, plans may occasionally find it in their best interest to pay claims and then seek reimbursement from contracting entities.

particular case is a question of law to be resolved by the court. [Citation.] [¶] A judicial conclusion that a duty is present or absent is merely ' "a shorthand statement . . . rather than an aid to analysis . . . . '[D]uty,' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' [Citation.]" (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835] (*Bily*); see also *Quelimane, supra,* 19 Cal.4th at pp. 57-58.)

■ Where there is no privity of contract between parties in a case involving purely economic loss, California courts have evaluated the question of duty by looking to the general factors set forth in *Biakanja v. Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358] (*Biakanja*): "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." (*Id.* at p. 650; see *Quelimane, supra,* 19 Cal.4th at p. 58; *Bily, supra,* 3 Cal.4th at p. 397.)

■ Desert Healthcare fails to satisfy even the first of the *Biakanja* factors. The conduct alleged to have been negligent must have been intended to affect that particular plaintiff, rather than just a class of persons to whom the plaintiff happens to belong. (*Ott v. Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, 1455-1456 [37 Cal.Rptr.2d 790].) The failure to show a particularized effect precludes a finding of a special relationship giving rise to a duty, because, to the extent the plaintiff was merely affected in the same way as other members of the plaintiff class, the case is nothing more than a traditional products liability or negligence case in which economic damages are not available. (*Ibid.*) The most that Desert Healthcare can show is that PacifiCare's transaction with DPA was intended to affect any hospitals that were unfortunate enough to contract with DPA, thus precluding a finding of duty.

Even assuming Desert Healthcare could satisfy some of the *Biakanja* factors, we would still find no duty as a matter of policy. ■ Although "[p]rivity of contract is no longer necessary to recognition of a duty in the business context and public policy may dictate the existence of a duty to third parties," "[r]ecognition of a duty to manage business affairs so as to prevent purely economic loss to third parties in their financial transactions is

the exception, not the rule, in negligence law." (*Quelimane, supra,* 19 Cal.4th at p. 58.) In particular, where the plaintiffs are sophisticated, knowledgeable entities, distinguishable from the "presumptively powerless consumer," "[a]s a matter of economic and social policy, [the plaintiffs] should be encouraged to rely on their own prudence, diligence, and contracting power, as well as other informational tools. This kind of self-reliance promotes sound investment and credit practices and discourages the careless use of monetary resources." (*Bily, supra,* 3 Cal.4th at p. 403.) Desert Healthcare is a large corporate entity well versed in the intricacies of the health care financing system. Thus, it was more than capable of protecting itself through diligence and prudence, and by exercising its own considerable contracting power.

■ Desert Healthcare also asserts that the regulations governing health care service plans impose a duty upon plans to ensure the financial well-being of risk-bearing entities. (See Cal. Code Regs., tit. 28, § 1300.70, subd. (b)(2)(H) ["A plan that has capitation or risk-sharing contracts must: [¶] 1. Ensure that each contracting provider has the administrative and financial capacity to meet its contractual obligations . . . ."].) However, because the creation of a duty of care involves fundamental policy decisions, the Legislature cannot delegate that responsibility to an administrative body. (*California Service Station etc. Assn. v. American Home Assurance Co.* (1998) 62 Cal.App.4th 1166, 1175-1176 [73 Cal.Rptr.2d 182].) Thus, a negligence duty cannot be derived from an administrative regulation. (*Ibid.*)

Desert Healthcare also notes that because the negligence claims were new to the second amended complaint, it should be given an opportunity to amend the complaint to cure any defects. However, because there is no reasonable possibility that Desert Healthcare can establish a legal duty merely by amending its factual allegations, leave to amend was properly denied. (*Quelimane, supra,* 19 Cal.4th at p. 39.)

## 4. *Unfair Competition*

■ Desert Healthcare argues that PacifiCare's business practices are "unlawful, unfair or fraudulent" within the meaning of the UCL. (Bus. & Prof. Code, § 17200 et seq.) In particular, Desert Healthcare notes PacifiCare's practices of requiring providers to waive rights against PacifiCare and its subscribers, and transferring its risk to intermediaries such as DPA. Of course, these are nothing more than complaints about the capitation agreements between PacifiCare and DPA, agreements which are standard in the industry and, as noted above, were specifically approved of by the Knox-Keene Act. As such, there was nothing unlawful, unfair, or fraudulent about those agreements.

Additionally, assuming that Desert Healthcare could amend its complaint to state a valid UCL claim, we do not believe that judicial intervention under the guise of the UCL would be proper in this case. As Justice Brown has noted, California courts have long applied an abstention doctrine in cases involving matters of complex economic policy. (See *Quelimane, supra,* 19 Cal.4th at p. 62 (dis. opn. of Brown, J.); *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 596-597 [71 Cal.Rptr.2d 731, 950 P.2d 1086] *(Stop Youth Addiction)* (dis. opn. of Brown, J.).) Although Justice Brown's abstention proposal has yet to be explicitly adopted by the majority of the court, its legal underpinnings remain valid.[6]

The notion of abstention in the context of the UCL originally arose in cases involving the intersection of federal and state law. In *Diaz v. Kay-Dix Ranch* (1970) 9 Cal.App.3d 588 [88 Cal.Rptr. 443] *(Diaz),* migratory farm-workers filed a class action suit under former Civil Code section 3369, the predecessor to the current UCL, seeking to enjoin the employment of illegal immigrants in the farming industry. *(Diaz, supra,* at pp. 590-591.) The trial court sustained the defendant's demurrer and the plaintiffs appealed. *(Ibid.)* The *Diaz* court framed the issue on appeal as a question of whether injunctive relief was proper *(id.* at p. 592) and concluded that it was not: "Plaintiffs seek the aid of equity because the national government has breached the commitment implied by national immigration policy. It is more orderly, more effectual, less burdensome to the affected interests, that the national government redeem its commitment. Thus the court of equity withholds its aid." *(Id.* at p. 599.) The Supreme Court subsequently adopted the *Diaz* rationale in *People ex rel. Dept. of Transportation v. Naegele Outdoor Advertising Co.* (1985) 38 Cal.3d 509, 523 [213 Cal.Rptr. 247, 698 P.2d 150] *(Naegele),* another case involving the intersection of federal and state law in the context of regulating billboards on Indian lands. (See also *Congress of Cal. Seniors v. Catholic Healthcare West* (2001) 87 Cal.App.4th 491, 510-511 [104 Cal.Rptr.2d 655].)

Although the abstention doctrine enunciated in *Diaz* and *Naegele* could be limited to the context of federal-state relations, the underlying rationale—

---

[6]Arguably, neither of those cases warranted abstention. For instance, *Stop Youth Addiction* involved a UCL action aimed at stopping retailers from selling cigarettes to minors in violation of a Penal Code provision. *(Stop Youth Addiction, supra,* 17 Cal.4th at pp. 558-559.) The sale of cigarettes to minors does not involve the sort of complex economic policy issues that normally warrant abstention. *Quelimane* was a bit more economically complex, involving an alleged conspiracy by title insurers to refuse to insure properties purchased at tax sales. *(Quelimane, supra,* 19 Cal.4th at p. 33.) However, the *Quelimane* majority implicitly adopted Justice Brown's abstention proposal, rejecting the plaintiff's argument on a "major point" by citing a leading abstention case for the proposition that "[w]hether an insurer should be required to offer a particular class of insurance or insure particular risks are matters of complex economic policy entrusted to the Legislature." *(Id.* at p. 43.)

that a court of equity has the discretion to withhold its aid—has been applied outside that context. In *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205 [27 Cal.Rptr.2d 396] (*Grocers*), the plaintiff filed a UCL action based on the alleged unconscionability of check processing fees charged by the defendant. (*Id.* at pp. 209-210.) The trial court found the fees to be unconscionable and issued an injunction reducing the allowable fees, but declined to award restitution. (*Id.* at pp. 211-212.) The appellate court reversed, concluding in part that injunctive relief is discretionary and the granting of such relief was an abuse of discretion under the circumstances. (*Id.* at p. 218.) The *Grocers* court noted that "[j]udicial review of one service fee charged by one bank is an entirely inappropriate method of overseeing bank service fees. . . . [¶] This case implicates a question of economic policy: whether service fees charged by banks are too high and should be regulated. 'It is primarily a legislative and not a judicial function to determine economic policy.' " (*Ibid.*; see also *Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 203, fn. 35 [91 Cal.Rptr.2d 534].)[7]

Furthermore, in *Wolfe v. State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554 [53 Cal.Rptr.2d 878] (*Wolfe*), the court similarly rejected a UCL claim based on the refusal by insurers to issue earthquake insurance policies following the 1994 Northridge earthquake. The *Wolfe* court cited *Grocers* and concluded: "Assuming for discussion's sake only that appellant can state a cause of action for unfair trade practices[,] . . . that by itself does not permit unwarranted judicial intervention in an area of complex economic policy." (*Id.* at pp. 564-565; see also *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1502-1503, 1509 [82 Cal.Rptr.2d 368].) *Wolfe* was subsequently cited with approval by the Supreme Court for the proposition that "[w]hether an insurer should be required to offer a particular class of insurance or insure particular risks are matters of complex economic policy entrusted to the Legislature." (*Quelimane, supra*, 19 Cal.4th at p. 43.)

Therefore, because the remedies available under the UCL, namely injunctions and restitution, are equitable in nature, courts have the discretion to abstain from employing them. Where a UCL action would drag a court of equity into an area of complex economic policy, equitable abstention is appropriate. In such cases, it is primarily a legislative and not a judicial function to determine the best economic policy.

The instant case is a perfect example of when a court of equity should abstain. Desert Healthcare essentially argues that PacifiCare abused the

---

[7]*Grocers* also involved the intersection of federal and state law to the extent that the federal government has the primary role in overseeing banking fees. (*Grocers, supra*, 22 Cal.App.4th at pp. 218-219.)

capitation system by transferring too much risk to its intermediary without adequate oversight. In order to fashion an appropriate remedy for such a claim, be it injunctive or restitutionary, the trial court would have to determine the appropriate levels of capitation and oversight. Such an inquiry would pull the court deep into the thicket of the health care finance industry, an economic arena that courts are ill-equipped to meddle in. As such, there is no proper role for the court of equity to play in the instant dispute.

## DISPOSITION

The judgment is affirmed. Defendant to recover its costs on appeal.

McKinster, J., and Ward, J., concurred.

On December 20, 2001, the opinion was modified to read as printed above.