Filed 4/2/14 Opinion on rehearing

***CERTIFIED FOR PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CENTINELA FREEMAN EMERGENCY MEDICAL ASSOCIATES et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> HEALTH NET OF CALIFORNIA, INC., et al., <br><br> Defendants and Respondents. | B238867a <br><br> (Los Angeles County <br> Super. Ct. No. BC449056) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John Shepard Wiley, Judge.  Reversed and remanded.

Michelman & Robinson, Andrew H. Selesnick and Jason O. Cheuk for Plaintiffs and Appellants.

California Medical Association, Center for Legal Affairs, Francisco J. Silva, Long X. Do and Michelle Rubalcava as Amicus Curiae on behalf of Plaintiffs and Appellants, California Medical Association, California Hospital Association, California

Orthopaedic Association, California Radiological Society and California Society of Pathologists.

Astrid G. Meghrigian as Amicus Curiae on behalf of Plaintiffs and Appellants for California Chapter of the American College of Emergency Physicians.

Reed Smith, Margaret M. Grignon, Kurt C. Petersen, Kenneth N. Smersfelt and Zareh A. Jaltorossian; Crowell & Moring, William A. Helvestine, Ethan P. Schulman and Damian D. Capozzola; Attorneys for Blue Cross of California dba Anthem Blue Cross; Jennifer S. Romano, Attorney for Pacificare of California dba Secure Horizons Health Plan of America; Manatt, Phelps & Phillips, Gregory N. Pimstone, Joanna S. McCallum and Jeffrey J. Maurer, Attorneys for California Physicians' Service dba Blue Shield of California; Gonzalez Saggio & Harlan LLP, Don A. Hernandez and Jamie L. Lopez, Attorneys for SCAN Health Plan; Gibson, Dunn & Crutcher, Kirk A. Patrick and Heather L. Richardson, Attorneys for Aetna Health of California; DLA Piper, William P. Donovan, Jr. and Matthew D. Caplan, Attorneys for Cigna HealthCare of California, Inc., Defendants and Respondents.

Barger & Wolen, John M. LeBlanc and Sandra I. Weishart as Amicus Curiae on behalf of Defendants and Respondents, California Association of Health Plans.

————————————————————

The law imposes a duty on emergency room physicians to treat patients regardless of their ability to pay. When those patients are enrollees in health care service plans (HMO's),[1] the law imposes an obligation on the HMO's to reimburse the physicians for emergency treatment provided to the enrollees, even when the physicians were not under contract to the HMO's. HMO's sometimes delegate their health care obligations to independent practice associations (IPA's); HMO's are statutorily permitted to delegate to IPA's their obligation to reimburse emergency physicians. In this case, the HMO's delegated responsibility for some of their enrollees to an IPA;[2] the delegation included the duty to reimburse emergency physicians. At some point, the IPA began experiencing financial problems and, after a number of years, ultimately ceased operating as a going concern. As the IPA's financial problems increased, it failed to reimburse physicians who had provided emergency services to its enrollees. The unpaid emergency physicians sought payment from the HMO's, which simply instructed the physicians to continue presenting their bills to the IPA, even though it was clear that the IPA would not be able to pay those bills. As they were required to do by law, the physicians continued to render emergency services to enrollees in the IPA; and, unfortunately, the IPA continued to fail to provide payment for those services.

---

[1]  "Health care service plans are often called HMO's (health maintenance organizations)." (*Watanabe v. California Physicians' Service* (2008) 169 Cal.App.4th 56, 59, fn. 3.)

[2]  It is not clear from the limited factual record before us whether, when an HMO delegates the obligations associated with an enrollee to an IPA, the enrollee is considered to be an enrollee in the IPA itself. We will, however, refer to such a patient as an enrollee in both the HMO and the IPA.

The physicians brought suit against the HMO's, alleging a cause of action for, among other things, negligent delegation. The HMO's successfully demurred to the complaint, and the physicians appeal. We hold that where: (1) a physician is obligated by statute to provide emergency care to a patient who is enrolled in both an HMO and an IPA with whom the physician has no contractual relationship; (2) the physician provides emergency care to the patient; (3) the HMO, which has a statutory duty to reimburse the physician, chose to delegate that duty to an IPA it knew, or had reason to know, would be unable to fulfill the delegated obligation; and (4) the IPA fails to make the necessary reimbursement, the resulting loss should be borne by the HMO and not the physician. In short, we hold that the HMO has a duty not to delegate its obligation to reimburse emergency physicians to an IPA it knows or has reason to know will be unable to pay. This duty is a continuing one, and thus will also be breached by an HMO's failure to act when it learns, after an initial delegation, that its delegatee is no longer able to fulfill its obligations. As the physicians have alleged sufficient facts to reflect the existence of a claim for a negligent delegation by the HMO's in this case, and/or a negligent failure to timely reassume a delegated obligation, we will reverse the judgment and remand the matter for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Parties*

As this case was resolved on demurrer, we consider the facts as pleaded by the emergency physicians and all reasonable inferences arising therefrom. This appellate matter arises out of two separate, but related, cases. Both cases arose out of the failure

4

of three related IPA's, known collectively by the parties as "La Vida."[3]  La Vida was alleged to have contracted with a number of HMO's, known, collectively, as "the HMO's" or "the plans."[4]

The plaintiffs are two different groups of physicians.  In one case, the plaintiffs are several partnerships of emergency room physicians working at several hospitals.[5]  In the other case, the plaintiff is a medical group of radiologists,[6] who also allegedly perform medical services on an emergency basis.  None of the plaintiff physician groups are alleged to have contracted with La Vida or any of the HMO's.[7]  As a result, our reference in this opinion to "plaintiffs" is limited to the physicians who have performed emergency room medical services and emergency radiological services for enrollees of the defendant HMO's and who do not have any contractual relationship with such

---

[3]     The precise names of the three La Vida entities are unclear.  They were named as:  (1) La Vida Medical Group & IPA, dba La Vida Prairie Medical Group; (2) La Vida Multispecialty Medical Centers, Inc.; and (3) Prairie Medical Group, Inc.  However, when the first La Vida entity answered the initial complaint, it indicated its actual name was "La Vida Medical Group, Inc."

[4]     The HMO's are:  Blue Cross of California dba Anthem Blue Cross of California, Health Net of California, Inc., Cigna Healthcare of California, Inc., Aetna Health of California, Inc., Pacificare of California dba Secure Horizons Health Plan of America, Care 1st Health Plan, California Physician's Service dba Blue Shield of California, and SCAN Health Plan.

[5]     The emergency room physician plaintiffs are Centinela Freeman Emergency Medical Associates, Sherman Oaks Emergency Medical Associates, Valley Presbyterian Emergency Medical Associates, and Westside Emergency Medical Associates.

[6]     The radiology plaintiff is Centinela Radiology Medical Group.

[7]     The radiology plaintiff had a prior contract with La Vida, but terminated it effective April 1, 2005.  Its complaint is based on facts occurring after it terminated the contract.

HMO's or La Vida. Our references to "emergency physicians" refer, in general, to physicians who provide emergency services to enrollees in HMO's and IPA's with whom the physicians have no contractual relationship.[8]

2. *Law Governing HMO's and IPA's*

In order to understand plaintiffs' allegations, a brief review of the law governing HMO's and IPA's is helpful. HMO's are governed by the Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act). (Health & Saf. Code, § 1340; *Van de Kamp v. Gumbiner* (1990) 221 Cal.App.3d 1260, 1269.) While the Knox-Keene Act had many goals, two of them identified by the Legislature were: (1) "[h]elping to ensure the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers" (Health & Saf. Code, § 1342, subd. (d)); and (2) "[e]nsuring the financial stability [of HMO's] by means of proper regulatory procedures." (Health & Saf. Code, § 1342, subd. (f).) As to the former, HMO's are required to provide basic health care services to their enrollees.

---

[8]    In its complaint, the radiology plaintiff alleged that its members provided services on both an emergency and non-emergency basis, and argued that the HMO's were obligated to reimburse them for both types of services. As to the non-emergency services, the radiology plaintiff alleged that, as its members work in a hospital setting, they "are powerless to do anything to control their income model or ensure payment of their claims, lacking the ability to pick and choose which patients to treat. Rather, they must perform their services for all patients who are at the hospital." As such, they argued they were entitled to compensation for their non-emergency services. On appeal, in which the emergency room and radiology plaintiffs filed consolidated briefing, it appears that the radiology plaintiff focuses solely on the services its members provided on an emergency basis. To the extent the radiology plaintiff continues to pursue its claim for reimbursement of non-emergency services, we reject the argument. As we shall discuss, the statutory requirements and policy concerns which define and motivate our result in this case, and to which this opinion is limited, relate only to *compulsory services provided on an emergency basis*.

(Health & Saf. Code, § 1367, subd. (i).) This requirement includes emergency health care services. (Health & Saf. Code, § 1345, subd. (b)(6).) As to the latter legislative goal, HMO's must prove to the Department of Managed Health Care (Department) that they are financially sound. (Health & Saf. Code, § 1375.1, subd. (a)(1).)

An HMO may contract with an IPA, which is considered a type of "risk-bearing organization." (Health & Saf. Code, § 1375.4, subd. (g)(1).) The IPA is a group of physicians that contracts with an HMO to provide services for the plan's enrollees, for which it receives compensation on a capitated or fixed payment basis. (*Ibid.*) As a risk-bearing organization, the IPA is also statutorily responsible for processing and paying claims made by physicians for services rendered by those physicians that are covered under the payments made by the plan to the IPA. (*Id*. at subd. (g)(1)(C).)

As HMO's which contract with IPA's are, basically, transferring responsibility for some or all of their enrollees to the IPA's, the IPA's are subject to certain financial condition requirements. Indeed, in determining whether an HMO is financially sound, the Department is to consider the "financial soundness of the plan's arrangements for health care services" and its agreements with providers. (Health & Saf. Code, § 1375.1, subds. (b)(1) & (b)(3).) Moreover, the Knox-Keene Act imposes specific requirements on any contract between an HMO and an IPA, including a contractual provision requiring the IPA to provide regular financial information to the HMO to "assist the [HMO] in maintaining the financial viability of its arrangements for the provision of health care services . . . . " (Health & Saf. Code, § 1375.4, subd. (a)(1).) The

7

Department has also promulgated regulations requiring the IPA to make direct financial reports to the Department. (Cal. Code Regs., tit. 28, § 1300.75.4.2.)

There are minimal financial criteria which every IPA must meet on a regular basis. (Health & Saf. Code, § 1375.4, subd. (b)(1)(A).) Should the IPA fail to meet those requirements, the IPA and the HMO's with which it contracts should agree to a "corrective action plan," approved by the Department,[9] designed to bring the IPA back into compliance. (Health & Saf. Code, § 1375.4, subd. (b)(4).)

When an HMO's contract with its IPA requires the IPA to pay claims, regulations impose certain conditions on the contract. Among other things, the contract must require the IPA to submit to the plan a quarterly claims payment performance report 30 days after the close of each quarter, disclosing its compliance status with relevant statutes. (Cal. Code Regs., tit. 28, § 1300.71, subd. (e)(3)(i).) The IPA's quarterly report shall include records of each physician dispute the IPA received, and the disposition of each dispute. (*Id*. at subd. (e)(3)(ii).) Finally, the contract shall include a provision "authorizing the plan to assume responsibility for the processing and timely reimbursement of provider claims in the event that the [IPA] fails to timely and accurately reimburse its claims." (*Id.* at subd. (e)(6).) The regulation further indicates that the plan's "obligation to assume responsibility for the processing and timely

---

[9]     Should the plans and the IPA fail to agree on the terms of the corrective action plan, the Department shall determine them. (Health & Saf. Code, § 1375.4, subd. (b)(4).)

reimbursement of . . . claims may be altered to the extent that the [IPA] has established an approved corrective action plan . . . ."[10] (*Ibid.*)

3. *Law Governing Emergency Medical Services and Reimbursement Therefor*

Under state and federal law, emergency services and care "shall be provided to any person requesting the services or care" at any hospital with appropriate facilities and qualified personnel. (Health & Saf. Code, § 1317, subd. (a); 42 U.S.C. § 1395dd(b).) Such services and care are to be provided without regard to the patient's "insurance status, economic status [or] ability to pay." (Health & Saf. Code, § 1317, subd. (b).) Indeed, the emergency services and care shall be provided without first questioning the patient as to insurance or ability to pay. (Health & Saf. Code, § 1317, subd. (d); 42 U.S.C. § 1395dd(h).)

As the Knox-Keene Act requires emergency services and care to be provided without questioning the patient as to insurance or ability to pay, the Act also requires that, when emergency services have been provided to plan enrollees, the HMO or its IPA "shall reimburse" the physicians.[11] (Health & Saf. Code, § 1371.4, subd. (b).) That section also provides that "[a] health care service plan may delegate the responsibilities

---

[10] We note that while the first sentence of this subdivision provides that the contract between the HMO and its IPA must "authoriz[e]" the plan to assume responsibility when the IPA fails to timely and accurately reimburse provider claims, the second sentence refers to an "obligation" to assume that responsibility. In other words, the regulation does not merely direct the HMO to contractually guarantee that it *may* reassume the obligation, it implies that in some circumstances the HMO *must* do so.

[11] The reimbursement is to be "the reasonable and customary value" for the services provided. (Cal. Code Regs., tit. 28, § 1300.71, subd. (a)(3)(B).)

enumerated in this section to the plan's contracting medical providers."[12]  (Health &

Saf. Code, § 1371.4, subd. (e).)

    4.    *Allegations of the Complaints*

We now turn to the allegations of the two complaints.  Plaintiffs allege that,

pursuant to their statutory duties, they provided services and care on an emergency basis

to La Vida enrollees.  Plaintiffs allege that they provided emergency services to La Vida

enrollees in the HMO's, although plaintiffs were not parties to any provider agreement

with either La Vida or the HMO's. After plaintiffs provided emergency services to

La Vida enrollees, they sought reimbursement from La Vida.

According to the allegations of the complaints, however, La Vida was unable to

pay.  It is unclear at what point La Vida became financially unsound.  Plaintiffs allege,

however, that at the time the HMO's delegated their responsibilities to La Vida and

throughout the duration of those contracts, the HMO's "knew or should have known of

La Vida's insolvency based on [1] financial reports submitted periodically by La Vida,

[2] notice directly from La Vida and indirectly from Plaintiffs and other health care

providers, and [3] the inadequate amounts of their own capitation payments to

---

[12]    We do note, however, that the regulations provide that "[a] plan's contract with a . . . capitated provider shall not relieve the plan of its obligations to comply with" several enumerated statutes, including Health and Safety Code section 1371.4. (Cal. Code Regs., tit. 28, § 1300.71, subd. (e)(8).)

La Vida." Nonetheless, the HMO's "delegated and continued delegating their payment obligations to La Vida."[13]

Plaintiffs allege that "[r]ather than helping to resolve the growing number of Plaintiffs' unpaid claims, the [HMO's] instead advised Plaintiffs to continue submitting claims directly to La Vida and continued their insufficient capitation payments, despite lacking any reasonable expectation that Plaintiffs' claims would be properly reimbursed and the mountain of evidence to the contrary." This allegedly continued until mid-2010, when the HMO's ultimately terminated their contracts with La Vida. Thereafter, La Vida went out of business.

As against the HMO's,[14] plaintiffs alleged causes of action for negligence, unfair competition, quantum meruit, open book account, and services rendered. Both groups of plaintiffs were represented by the same counsel, and the two complaints were virtually identical.[15] The cases were deemed related.

---

[13] Plaintiffs clearly alleged that the HMO's knew or should have known of La Vida's insolvency at the time of their *initial* delegation to La Vida. However, the pleadings are not clear as to when that occurred. Indeed, while the plaintiffs indicate that, "beginning in 2007 and continuing through each quarter thereafter," La Vida failed to meet the Department's minimal financial criteria, they do not allege whether any act of delegation occurred after that date. Nor do plaintiffs specifically allege that the HMO's knew or should have known of La Vida's insolvency prior to 2007.

[14] Plaintiffs' complaints also named La Vida as a defendant. La Vida, however, is not a party to this appeal.

[15] One of the HMO's, SCAN Health Plan, was named in the radiology plaintiff's action only.

11

5.    *The Demurrers*

The HMO's demurred to the complaints, arguing that the delegation of their statutory obligation to compensate emergency physicians for emergency services was both statutorily-permitted and absolute.  That is, once the plans had permissibly delegated the obligation to La Vida,[16] the emergency physicians had no recourse to the HMO's for payments La Vida was unable to make.  As to negligence, the plans argued that no duty arose for them to protect the financial interests of the third-party plaintiffs under the seminal case of *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*).[17]

---

[16]    The HMO's argued that their delegations to La Vida were, in fact, fully permitted by the Department, in that, at the time of the delegations, La Vida appeared on a list of qualified providers posted on the Department's website.  To the extent that the HMO's are contending that their delegations to La Vida were *necessarily* reasonable because of La Vida's appearance on this list, the argument is better suited to summary judgment than demurrer.  Preliminarily, plaintiffs' complaints do not allege the date or dates of the HMO's original delegations to La Vida, and the HMO's demurrers do not seek judicial notice of any evidence establishing those dates.  In any event, the HMO's argue that the delegation contracts were entered into "during or before 2007."  The HMO's submitted documentation in support of their demurrers which demonstrated that the Department's website indicated that, for the second quarter of 2007, La Vida had failed to meet the Department's requirement of resolving at least 95% of its claims within 45 days, and was therefore subject to a CAP.  In addition, the Department's website showed, for the 2007 fiscal year, that La Vida had failed to meet three of the Department's four grading criteria, including the requirement for maintaining positive working capital.  At least with respect to those delegation contracts entered into in 2007, this raises a question as to how much the HMO's knew of La Vida's financial troubles at the time of the delegations.  We are unwilling to state that, as a matter of law, it is reasonable for an HMO to enter into a delegation contract with an IPA it knows (or should know) is then currently subject to a CAP for failing to meet the Department's grading criteria.

[17]    *Biakanja* identified several factors to be considered in determining whether a duty exists.  "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to

12

Additionally, the HMO's argued that, to the extent the complaints sought equitable relief for unfair competition, the court should abstain from resolving the claim, as it involved complex issues of economic health care policy better determined by the Legislature and the Department.

The HMO's also represented that, from 2007 through 2009, La Vida was subject to a Department-approved corrective action plan.[18] The HMO's argued that, while La Vida was subject to the corrective action plan, the HMO's could not have terminated their delegation contracts with La Vida, "which is what Plaintiffs claim the [HMO's] should have done."[19] As we shall discuss, however, the plaintiffs do not argue that the

---

affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm. [Citations.]" (*Biakanja, supra*, 49 Cal.2d at p. 650.)

[18]   It does not appear to be seriously disputed that La Vida was subject to a corrective action plan. However, the fact is not technically before this court. The HMO's sought to establish the existence of a corrective action plan by means of a request for judicial notice of a letter and e-mail from the Department which referenced the corrective action plan. Plaintiffs opposed the request for judicial notice of these two documents. The trial court did not rule on the request for judicial notice. On appeal, the HMO's have not requested that this court take judicial notice of these documents.

[19]   This argument is something of an oversimplification. The applicable regulation provides that if a plan proposes to transfer enrollees away from an IPA "that is compliant" with a corrective action plan, and if the reassignment is based, on part, on the IPA's failure to meet financial requirements, the plan must request Department approval for the transfer. The Department may disapprove the transfer if it determines that: (1) the proposed reassignment will likely cause the IPA's failure within three months; (2) the IPA "has the financial and administrative capacity to provide timely access to care through an adequate network of qualified health care providers"; and (3) the IPA is not denying or delaying basic health care services or continuity of care to its enrollees. (Cal. Code Regs., tit. 28, § 1300.75.4.5, subd. (a)(6).) Although the

13

plans should have terminated their delegation contracts with La Vida in their entirety; they alleged only that the plans should have reassumed the responsibility to reimburse them for emergency services rendered.

In opposition to the demurrer, the plaintiffs again argued that the HMO's "delegated their own payment responsibilities to IPA[']s that the [p]lans knew were financially insolvent. Despite being informed on an ongoing basis that claims were not being paid and the IPA[']s were unlikely to ever pay them, the [HMO's] continued to delegate as long as they possibly could."

6.      *Ruling, Judgment and Appeal*

The trial court sustained the demurrers without leave to amend. The trial court concluded that the Knox-Keene Act permits delegation, and there is no liability for the delegator if the delegatee fails to pay. As the delegation was permissible, all causes of

HMO's sought judicial notice of the fact that La Vida was subject to a corrective action plan, they did not provide any evidence that La Vida was "compliant" with its corrective action plan. The HMO's also did not provide evidence that they had requested a transfer and the Department denied it; or, in the alternative, that a request would have been denied because the three criteria above would have been established as a matter of law. In fact, to the extent there is evidence on these matters, it is to the contrary. At some point in the process, it appears that the Department was amenable to the termination of the delegation contracts to La Vida; one HMO apparently terminated La Vida shortly before the Department ultimately ordered the remaining HMO's to do so. Indeed, the HMO's conceded the point by implication, stating that "[a]t no time from 2007 through the first three quarters of 2009" did the Department permit the Health Plans to terminate their La Vida delegations. But the Health Plans did not actually terminate La Vida until May or June of 2010, leaving some three quarters of a year in which they could have terminated La Vida, but did not. Moreover, given that the regulations provide that corrective action plans are generally to be completed within one year (Cal. Code Regs., tit. 28, § 1300.75.4.8, subd. (a)(5)), the plans' assertion that La Vida was subject to a corrective action plan from 2007 through 2009 strongly suggests that La Vida may not have been "compliant" with its plan.

14

action based on La Vida's failure to pay (unfair competition, quantum meruit, open book account, and services rendered) fail. As to the negligence cause of action, the court concluded that *Biakanja* bars relief. Specifically, the trial court concluded that there can be no cause of action for negligence unless the alleged negligent act was intended to harm the plaintiff specifically, as opposed to a class to which the plaintiff happens to belong. Here, the trial court found no intent to harm plaintiffs specifically. The court found that this fact alone required sustaining the demurrer, regardless of the remaining *Biakanja* factors, although it noted that the other factors weighed against recognizing a duty. In the course of its discussion, the court noted that the plaintiffs "have not alleged any facts to suggest the insolvency of [La Vida] was foreseeable to the health plans at the time the health plans delegated their payment obligations to [La Vida]."[20]

Judgment was entered in favor of the HMO's. The plaintiffs filed timely notices of appeal. We consolidated the cases on appeal.[21]

---

[20] As noted above (see footnote 13, *ante*), this is correct. However, plaintiffs did allege that the HMO's knew or should have known of La Vida's financial problems at the time of the initial delegation. Given the procedural posture of the case, if the trial court had concluded this fact was important to its reasoning and rationale, we assume leave to amend would have been granted.

[21] Amicus curiae briefs have been filed by the California Chapter of the American College of Emergency Physicians, California Medical Association, California Hospital Association, California Orthopaedic Association, California Radiological Society, and California Society of Pathologists, in support of plaintiffs; and California Association of Health Plans and California Association of Physician Groups in support of the HMO's.

## *ISSUES ON APPEAL*

The main issue on appeal is whether a cause of action exists, on behalf of emergency physicians, against HMO's, for the negligent delegation of the obligation to reimburse the emergency physicians, when the HMO's have delegated their duty to an IPA they knew or had reason to know was financially unable to satisfy it. After resolving this question in the affirmative, we then address the related question of whether the cause of action necessarily includes a negligent failure to reassume the reimbursement obligation, once the HMO's know or should know that the delegatee is unable to execute the duty delegated to it. We answer this question in the affirmative as well. We reject the HMO's argument that we should abstain from resolving this dispute.

## *DISCUSSION*

1.  *Standard of Review*

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has

16

abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

2. *Existing Authority*

As noted above, the main issue on appeal is whether a cause of action exists for negligent delegation of an HMO's statutory obligation to reimburse emergency physicians. In addressing this question, we are not writing on a clean slate. Two courts have addressed the question directly, reaching contradictory results. (Compare *California Emergency Physicians Medical Group v. PacifiCare of California* (2003) 111 Cal.App.4th 1127, 1135-1136 (*CEP*) [finding no negligence cause of action] with *Ochs v. PacifiCare of California* (2004) 115 Cal.App.4th 782, 796-797 (*Ochs*) [finding such a cause of action exists].) We will ultimately conclude that *Ochs* is the better reasoned of the two opinions, and follow it. As these cases are best understood in context of the development of the law, we must begin with two cases predating *CEP* and *Ochs*.

a. *Cases Involving Physicians Who Had Contracted With the IPA*

Unfortunately, La Vida is not the first IPA to fail, leaving physicians unpaid. The first cases involving physicians seeking compensation from an HMO for services rendered to enrollees in IPA's for which the IPA's were unable to pay, involved physicians who had directly contracted with the IPA's. The first such case was *California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001)

17

94 Cal.App.4th 151 (*California Medical*). In that case, the plaintiff physicians[22] argued that, in order to have access to the majority of insured patients in the state, it was necessary to participate in HMO's. In order to participate in the defendant HMO, the plaintiff physicians were required to enter into agreements with the IPA's.[23] When the IPA's were unable to pay "due to their actual or imminent insolvency," the physicians brought suit against the HMO.

The physicians relied on Health and Safety Code section 1371, which provides that a plan must reimburse a physician's claim within a certain number of days. The statute further provides, "The obligation of the plan to comply with this section shall not be deemed to be waived when the plan requires its medical groups, independent practice associations, or other contracting entities to pay claims for covered services." The physicians argued that this provision required the HMO to make timely payment when its IPA's failed to do so. In *California Medical, supra,* 94 Cal.App.4th at p. 161, Division One of the Fourth Appellate District disagreed. Construing the non-waiver clause in the context of the full statute, the entire Knox-Keene Act, and legislative history, the court concluded that the clause simply provided that the procedural requirements of Health and Safety Code section 1371 apply to an HMO's delegatees as well as the HMO itself. (*California Medical, supra,* 94 Cal.App.4th at pp. 161-163.)

---

[22]    The named plaintiff was actually the physicians' assignee.

[23]    Indeed, in their agreements with the IPA's, the plaintiff physicians *agreed* to look solely to the IPA's for payment. (*California Medical, supra,* 94 Cal.App.4th at p. 157, fn. 7.)

A similar factual situation arose later that same year, before Division Two of the Fourth Appellate District, in *Desert Healthcare Dist. v. PacifiCare FHP, Inc.* (2001) 94 Cal.App.4th 781 (*Desert Healthcare*).  In *Desert Healthcare,* the plaintiff physician group had directly contracted with the IPA, and the group was unpaid when the IPA failed.  (*Id*. at p. 785.)  The physician group brought suit against the HMO, alleging a cause of action for negligence.  Specifically, it sought to pursue a cause of action for: (1) negligent failure to ensure the financial stability of the IPA; (2) negligence per se for violating Health and Safety Code section 1371; and (3) negligence arising from the special relationship between the plaintiff physician group and the HMO.  (*Desert Healthcare, supra,* 94 Cal.App.4th at p. 785.)  The court concluded there was no duty to ensure the financial stability of the IPA.  Specifically, the *Desert Healthcare* court looked to the *Biakanja* factors.  The first such factor is "the extent to which the transaction was intended to affect the plaintiff."  (*Biakanja, supra,* 49 Cal.2d at p. 650.)  The *Desert Healthcare* court found that this factor could not be met, stating, "The conduct alleged to have been negligent must have been intended to affect that particular plaintiff, rather than just a class of persons to whom the plaintiff happens to belong. [Citation.]  The failure to show a particularized effect precludes a finding of a special relationship giving rise to a duty, because, to the extent the plaintiff was merely affected in the same way as other members of the plaintiff class, the case is nothing more than a traditional products liability or negligence case in which economic damages are not available.  [Citation.]  The most that [plaintiffs] can show is that [the HMO]'s transaction with [the IPA] was intended to affect any hospitals that were unfortunate

enough to contract with [the IPA], thus precluding a finding of duty." (*Desert Healthcare, supra,* 94 Cal.App.4th at p. 792.)

The *Desert Healthcare* court went on to state that, even if other *Biakanja* factors weighed in favor of finding a duty, it would not find a duty due to policy reasons. (*Id.* at p. 792.) The court explained that recognition of a duty to manage one's business affairs so as to prevent purely economic loss to third parties in their financial transactions is the exception, not the rule, in negligence law. In particular, the court stated, when plaintiffs are sophisticated, knowledgeable entities, they should be encouraged to rely on their own prudence, diligence, and contracting power, as well as other informational tools. (*Id.* at pp. 792-793.) As plaintiff was "a large corporate entity well versed in the intricacies of the health care financing system," it was "more than capable of protecting itself through diligence and prudence, and by exercising its own considerable contracting power." (*Id.* at p. 793.)

Before addressing *CEP* and *Ochs*, we emphasize the fundamental distinction between the two cases just discussed and the instant case. In *California Medical* and *Desert Healthcare*, the plaintiffs had *voluntarily contracted* with the IPA; in the instant case, the plaintiffs had *not* contracted with La Vida or any of the HMO's. While the plaintiff in *Desert Healthcare* could have "protect[ed] itself through diligence and prudence, and by exercising its own considerable contracting power," the plaintiffs in the instant case were required by statute to provide emergency services and care to La Vida enrollees, and had no means to protect themselves from La Vida's insolvency. As we shall discuss, we find this distinction critical.

20

b.      *CEP Extends Desert HealthCare to Emergency Physicians*

In 2003, Division One of the Fourth Appellate District was presented with the case of emergency physicians who had not contracted with the IPA.  When the IPA (which ultimately went bankrupt) failed to reimburse the plaintiff emergency physician group for emergency services provided to its enrollees, the emergency physician group sued the HMO which had delegated responsibility for the enrollees to the IPA.  (*CEP, supra,* 111 Cal.App.4th at pp. 1129-1130.)

This case concerned not section 1371 of the Health and Safety Code, but rather section 1371.4, which specifically provides that the plans must reimburse the emergency physicians.  As discussed above, that section also provides that "[a] health care service plan may delegate the responsibilities enumerated in this section to the plan's contracting medical providers." [24]  (Health & Saf. Code, § 1371.4, subd. (e).)  The *CEP* court concluded, based on its reading of the statutory language and legislative history, that the Legislature's use of the word "delegate" was intended to mean the duty

_____

[24]      Health and Safety Code section 1371.4 , subdivision (b) provides that "[a] health care service plan, *or its contracting medical providers*, shall reimburse providers for emergency services and care provided to its enrollees . . . . " (Italics added.)  At the time of the *CEP* case, the italicized language was not part of the statute.  That language was added by a 2008 amendment.  (Stats. 2008, ch. 603, § 4.)  The legislative history of the statute gives no explanation for the amendment, and the parties in the instant appeal attach no significance to it.  We assume that the amendment was a clarification of existing law, as the language added to subdivision (b) follows from the delegation allowed pursuant to subdivision (e).  In their petition for rehearing, the HMO's seek an opportunity to brief the legislative history of this amendment.  As our decision is in no way "based upon" the legislative history, no rehearing is necessary on that ground. (Gov. Code, § 68081.)  In any event, interpretation of Health and Safety Code section 1371.4 has always been at issue in this case.  If the HMO's had believed the legislative history of the amendment was relevant, they could have discussed it in their initial appellate briefing.

was fully delegable and that, if a health plan delegated its statutory duty, it retained no liability. (*CEP, supra,* 111 Cal.App.4th at pp. 1132-1133.)

The *CEP* plaintiff had alleged a cause of action for negligence, based on an alleged duty to use due care so as not to cause harm to plaintiff's financial interests. The court found there was no such duty, relying on the *Desert Healthcare* court's analysis of the *Biakanja* factors. (*CEP, supra,* 111 Cal.App.4th at pp. 1135-1136.) The court acknowledged that the factual scenario was somewhat different as the *CEP* plaintiff had not contracted with the intermediary, but nonetheless concluded that *Desert Healthcare*'s analysis of the first *Biakanja* factor applied. The *CEP* court stated that, "the most [plaintiff] can show is that [the HMO's] contract with [the IPA] was intended to affect any emergency services provider whom [the IPA] had an obligation to pay." (*Id*. at p. 1136.) This was insufficient, in the view of the *CEP* court, to establish that the HMO's conduct was directed toward the plaintiff. (*Ibid.*) Moreover, the *CEP* court stated that, even if the other *Biakanja* factors applied, it would not find a duty existed, because such a duty would be contrary to the absolute right to delegate found in Health and Safety Code section 1371.4, subdivision (e).[25] (*CEP, supra,* 111 Cal.App.4th at p. 1136.)

---

[25] In the HMO's brief on appeal, they argued that the *CEP* court concluded Health and Safety Code section 1371.4, subdivision (e) provided a safe harbor against any negligence claim, however, regardless of *Biakanja*. The *CEP* court's analysis of the negligence cause of action consists of a full page of discussion of the *Biakanja* factors (*CEP, supra,* 111 Cal.App.4th at pp. 1135-1136), followed by a short paragraph stating only, "Even assuming [plaintiffs] could satisfy some of the *Biakanja* factors, we would still find no duty as a matter of policy. The Legislature has approved risk-sharing plans, such as capitation, and has allowed health care service plans to delegate payment

c.       *Ochs Takes a Different Position*

In 2004, Division Six of the Second Appellate District[26] addressed the same factual scenario as in *CEP*,[27] but reached the opposite result.  The plaintiff emergency physician had not contracted with the IPA or the defendant HMO.  When the IPA failed, the plaintiff emergency physician sought compensation from the HMO, alleging causes of action for, among other things, a statutory violation of Health and Safety Code section 1371.4, and negligence.

On appeal from an order sustaining the HMO's demurrer without leave to amend, the *Ochs* court agreed with *CEP* that the language and legislative history of Health and Safety Code section 1371.4 compel the conclusion that the duty to pay emergency physicians is delegable, and that the delegating HMO retains no liability.

---

responsibility to contracting medical providers.  Finding a duty in this situation is directly contrary to section 1371.4, subdivision (e) of the Knox-Keene Act."  (*Id*. at p. 1136.)  It is not at all clear that the *CEP* court was concluding that Health and Safety Code section 1371.4 barred a negligence action as a matter of law, as opposed to simply concluding that policy reasons would outweigh any *Biakanja* factors that would favor finding a duty.

[26]    We identify the courts from which these cases originated only for the purpose of noting that, at the time the *Ochs* court addressed the issue, the three existing opinions had originated from the same appellate district.  Thus, there was hardly a statewide unanimity of opinion on the issue.

[27]    Indeed, it appears that both cases arose out of the failure of the same IPA, Family Health Network.  (*CEP, supra,* 111 Cal.App.4th at p. 1130; *Ochs, supra,* 115 Cal.App.4th at pp. 787-788.)

Thus, no cause of action existed against the HMO for violating Health and Safety Code section 1371.4.[28] (*Ochs, supra,* 115 Cal.App.4th at pp. 789-793.)

On appeal, the emergency physician argued that he could allege that the HMO knew or should have known that the IPA was insolvent, at the time it contracted with the IPA. The court concluded that the plaintiff should be granted leave to amend to plead a negligence cause of action based on this fact. (*Ochs, supra,* 115 Cal.App.4th at pp. 796-797.) The court enumerated the *Biakanja* factors and concluded that they could support the existence of a duty. (*Id.* at p. 797.) The court specifically disagreed with *CEP* and *Desert Healthcare* to the extent that those cases held that, when economic damages are sought, the conduct must have been intended to affect the specific plaintiff, rather than persons of the class to which the plaintiff belongs. Instead, the *Ochs* court stated, "it is well established that liability for negligent conduct may be imposed when

---

[28]  The court added, in language with which we agree, the following commentary: "Ochs argues that it is unjust to allow PacifiCare to delegate its statutory duty to pay for noncontract emergency services when physicians are required by law to provide such services regardless of a patient's inability to pay. We have no quarrel with the proposition that emergency care providers should be paid for the important services they provide, and, were we writing on a clean slate, we might well conclude that it is preferable for the health care service plan to bear the ultimate cost when an intermediary that it has selected becomes insolvent. But we are not at liberty to rewrite the relevant statutes or review their legislative history to comport with a generalized sense of fairness. The Knox-Keene Act is a comprehensive scheme for regulating health care plans, and its provisions are the product of a variety of interests and concerns. The Legislature addressed some of the concerns of emergency room physicians when it enacted section 1371.4 in 1994 and required health care service plans to pay for emergency services by noncontracting physicians. But this new right was tempered by a provision that specifically allowed plans to delegate their payment responsibilities, thus allowing them to better manage their costs and pass the savings along to their insureds. Whatever the flaws of the current system, the solution must come from the Legislature and not the courts." (*Ochs, supra,* 115 Cal.App.4th at p. 793.)

a duty is owed to the plaintiff *or to a class of which the plaintiff is a member*. [Citations.]" (*Id*. at p. 797.)

d. *Balance Billing is Prohibited*

In *Ochs*, the plaintiff had also sought a declaration that if the IPA and the HMO did not pay the plaintiff emergency physician's bills, the plaintiff could bill the patients directly. The *Ochs* court rejected the argument based on misjoinder of defendants. (*Ochs, supra,* 115 Cal.App.4th at p. 796.) However, it noted, in dicta, that it appeared that the emergency physician may, in fact, have a remedy against the individual patients, who would then have a remedy against the HMO with whom they had contracted. (*Ibid.*)

This analysis was based on Health and Safety Code section 1379, a statute which prohibits a physician which has contracted with a plan from billing the patient for any sums owed by the plan (a practice known as "balance billing.") As the statute clearly applies to physicians who have contracted with HMO's, the *Ochs* court took the position that emergency physicians who have not contracted with HMO's are not barred from balance billing. (*Ochs, supra,* 115 Cal.App.4th at p. 796.) Five years after *Ochs*, however, the Supreme Court rejected this interpretation, concluding that emergency physicians may not balance bill patients, even if they had not contracted with the plans. (*Prospect Medical Group, Inc. v. Northridge Emergency Medical Group* (2009) 45 Cal.4th 497 (*Prospect*).)

*Prospect* is important to our analysis for both what it did decide and what it did not decide. In *Prospect*, there was no issue of an insolvent IPA; indeed, for the

25

purposes of its discussion, the Supreme Court used the term "HMO's" to refer to *both* the HMO's and their delegatee organizations. In that context, the court concluded that balance billing was inappropriate. Interpreting the Knox-Keene Act as a whole, the court concluded "that billing disputes over emergency medical care must be resolved solely between the emergency room doctors, who are entitled to a reasonable payment for their services, and the HMO, which is obligated to make that payment. A patient who is a member of an HMO may not be injected into the dispute. Emergency room doctors may not bill the patient for the disputed amount." (*Prospect, supra,* 45 Cal.4th at p. 502.) The court stated in a footnote, however, that its holding was limited to the situation before it, "billing the patient for emergency services when the doctors have recourse against the patient's HMO. We express no opinion regarding the situation when no such recourse is available; for example, if the HMO is unable to pay or disputes coverage." (*Id.* at p. 507, fn. 5.)

As *Prospect* was not concerned with an insolvent IPA, and, in fact, considered IPA's and HMO's the same for the purposes of its analysis, it did not expressly resolve the issue of whether an emergency physician can balance bill a patient when the IPA is insolvent and the HMO refuses to pay. However, language in the opinion suggests that the court would not permit balance billing in that situation either. Specifically, the court rejected the *Ochs* dicta suggesting balance billing may be possible, explaining that Health and Safety Code "[s]ection 1371.4, subdivision (b), does not say that patients must pay the emergency room doctors and then turn to their HMO's for reimbursement. Rather it states that the 'health care service plan . . . shall reimburse providers for

26

emergency services and care provided to its enrollees . . . . ' This language does not authorize the roundabout route of the doctor collecting from the patient, who must then collect from the HMO. Rather, it mandates that the HMO pay the doctor directly. It does not involve the patient in the payment process at all." (*Id*. at p. 509.) This strongly suggests that the Supreme Court would not permit an emergency physician, unpaid by an insolvent IPA, to balance bill the patient, who would then have a remedy against the HMO. "[U]nder the Knox-Keene Act, HMO members are *not* liable to pay for emergency care." (*Id*. at p. 510.) Emergency physicians should instead resolve their disputes directly with the HMO's.[29] (*Id*. at p. 508.)

3.    *A Cause of Action Exists for Negligent Delegation*

Given the agreement of *CEP* and *Ochs* on the issue, it is too late in the day to argue that emergency physicians have a direct cause of action against HMO's under Health and Safety Code section 1371.4 when the IPA's fail to reimburse the emergency physicians for services provided to their enrollees. Indeed, plaintiffs in this case do not expressly allege such a cause of action. Instead, they argue, pursuant to *Ochs*, that they have a cause of action against the defendant HMO's for negligent delegation of the Health and Safety Code section 1371.4 duty. In other words, it is clear that the HMO's have a duty under Health and Safety Code section 1371.4, subdivision (b) to reimburse

---

[29]    Prior to the *Prospect* decision, *Bell v. Blue Cross of California* (2005) 131 Cal.App.4th 211 held that an emergency physician may directly sue a plan for reasonable reimbursement, even when the physician had not contracted with the plan. (*Id*. at p. 220.) In *Prospect,* the Supreme Court stated, "Because emergency room doctors prevailed in *Bell* [citation] and won the right to resolve their disputes directly with HMO's, no reason exists to permit balance billing." (*Prospect, supra,* 45 Cal.4th at p. 508.)

27

plaintiffs for emergency services provided to the HMO's enrollees. It is also clear that under Health and Safety Code section 1371.4, subdivision (e), the HMO's may delegate that duty to their "contracting medical providers" (e.g., IPA's). The critical question raised by this case is (1) whether HMO's may delegate their reimbursement duty to *any* IPA, regardless of the financial stability of that IPA, or (2) whether the HMO's have a duty *not* to delegate their Health and Safety Code section 1371.4 reimbursement obligation to an IPA that the HMO's know, or have reason to know, is financially unable to meet that duty.

The parties agree that the resolution of this question is governed by *Biakanja* and its progeny. The law imposes no liability for alleged wrongdoing unless the defendant owed a duty to the plaintiff to avoid the asserted wrongdoing. "Whether such a duty existed is a question of law and depends on a judicial weighing of the policy considerations for and against the imposition of liability under the circumstances." (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 342.) "Privity of contract is no longer necessary to recognition of a duty in the business context and public policy may dictate the existence of a duty to third parties." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 58.) "Even when only injury to prospective economic advantage is claimed, recovery is not foreclosed. Where a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity." (*J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 804.)

28

The factors to be considered in determining the existence of a duty, as set forth in *Biakanja*, include: (1) the extent to which the transaction was intended to affect the plaintiffs; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to the defendant's conduct; and (6) the policy of preventing future harm. (*Biakanja, supra,* 49 Cal.2d at p. 650.) Later cases have considered additional factors, including whether extending liability would impose an undue burden on the defendant's profession. (*Giacometti v. Aulla, LLC* (2010) 187 Cal.App.4th 1133, 1137.) We consider each of these factors.

  a. *The Transaction Was Intended to Affect the Plaintiffs*

First, we consider the extent to which the transaction was intended to affect the plaintiffs. The HMO's had a statutory duty of reimbursement to emergency physicians; by means of the transaction in question, they delegated that duty, allegedly to an IPA they knew or had reason to know was unable to fulfill that duty. The delegation transaction was necessarily intended to have an effect on the plaintiffs; it had a direct impact on whether they would receive compensation for the emergency services that they provided to the HMO's enrollees.

In this case, the trial court, in reliance on *Desert Healthcare*, concluded that the transaction was not intended to affect the plaintiffs, as the factor could only be found true if the conduct was intended to affect the particular plaintiff physicians, rather than a class of persons to which the plaintiffs happen to belong. The law is not so absolute. Our Supreme Court "has repeatedly eschewed overly rigid common law formulations of

29

duty in favor of allowing compensation for foreseeable injuries caused by a defendant's want of ordinary care." (*J'Aire Corp. v. Gregory, supra,* 24 Cal.3d at p. 805.) Liability may be imposed when there is a duty of care owed by the defendant to the plaintiff or to a class of which the plaintiff is a member. (*Ott v. Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439.) Such a duty can arise from statute or contract, the nature of the defendant's activity, the relationship between the parties, or even the interdependent nature of human society. (*Id.* at p. 1449; *J'Aire Corp. v. Gregory, supra,* 24 Cal.3d at p. 803.)

We agree that the standard formulation, requiring a duty to be owed to the plaintiff specifically, rather than a class to which the plaintiff belongs, is sufficient in the usual case, in which the plaintiff and defendant are strangers to one another. (See e.g., *Ott v. Alfa-Laval Agri, Inc., supra,* 31 Cal.App.4th at pp. 1455-1456 [plaintiffs simply purchased defendant's product]; cf. *Quelimane Co. v. Stewart Title Guaranty Co., supra,* 19 Cal.4th at p. 58 [plaintiffs wanted defendants to sell title insurance for properties plaintiffs sought to sell].) This matter, however, is not the usual case. The defendant HMO's owed a *statutory duty* to emergency physicians; it is their allegedly negligent delegation of that duty which is at issue. The existence of the HMO's statutory duty owed to the entire class of emergency physicians who provide emergency services and care to the plans' enrollees justifies the conclusion that the plans' conduct was intended to affect the plaintiffs, even though they were part of a class.

30

b.      *The Harm to Plaintiffs Was Foreseeable*

The second factor is the foreseeability of harm to the plaintiffs.  It is alleged that the defendant HMO's knew or should have known of La Vida's financial difficulties at the time of the initial delegations.  Indeed, the plaintiffs further allege that the HMO's "knew or should have known that their neglect of La Vida's financial shortcomings would result in the failure of Plaintiffs to receive reasonable reimbursement for their covered services."  If proven, this would establish the second factor.[30]

c.      *It Is Certain That Plaintiffs Were Injured*

The third *Biakanja* factor is the degree of certainty that the plaintiff suffered injury.  Had the HMO's delegated their Health and Safety Code section 1371.4 reimbursement duty to a financially stable IPA, or had not delegated it at all, the plaintiffs would have been reimbursed in a reasonable amount for the emergency services they provided defendants' enrollees.  Thus, the plaintiffs were injured by defendants' allegedly negligent delegation.

---

[30]      In their petition for rehearing, the HMO's argue, for the first time, that the harm to plaintiffs was not foreseeable at the time the HMO's entered into the delegation contracts, as the delegation contracts pre-dated the Supreme Court's *Prospect* opinion prohibiting balance billing.  In other words, the HMO's argue that, at the time of the delegation, it was believed that emergency physicians could balance bill their patients if the IPA did not pay, so it was not foreseeable that the emergency physicians would be harmed by the delegation, even if they knew of La Vida's financial shortcomings.  We disagree.  The HMO's had a statutory obligation to reasonably reimburse the emergency physicians; it is alleged that they delegated that obligation to an IPA which they knew (or should have known) was unable to satisfy it.  If true, the financial harm to the emergency physicians was foreseeable, even if it was generally believed that the emergency physicians could seek reimbursement from the patients, whose own financial situation was wholly unknown.

31

d.      *There Is a Close Connection Between the Allegedly*
        *Negligent Delegation and the Harm Suffered*

The fourth factor is the closeness of the connection between the defendants'

conduct and the injury suffered.  While it can be said that La Vida's failure was the

direct cause of the plaintiffs not being reimbursed, La Vida's failure would have had no

impact on them (as they had not contracted with La Vida), had defendant HMO's not

delegated their statutory reimbursement duty to La Vida.  The plaintiffs allege that the

HMO's knew or had reason to know of La Vida's financial difficulties at the time of the

delegation; thus, there is a close connection between the delegation of the statutory

reimbursement duty to a financially troubled IPA and the result that the plaintiffs were

not reimbursed.

e.      *Substantial Moral Blame Attaches to Defendants' Alleged Conduct*

The fifth factor is the moral blame attaching to the defendants' conduct.  Here,

we necessarily consider and emphasize the unique position in which the plaintiffs find

themselves.  They are required by law to provide emergency services to all patients in

need, regardless of ability to pay.  Emergency physicians cannot pick and choose their

patients, but must simply treat all emergency patients.  The law then imposes a duty on

the HMO's – those entities which had contracted with the patients and agreed, for

receipt of a premium, to provide them with basic medical care, including emergency

services – to reimburse the emergency physicians for the emergency services provided

to their enrollees.  In other words, the HMO's had contracted with the patients to

provide them, for a price, with health care services, including emergency services, with

32

the understanding that those services may be provided by physicians whom the HMO's would be required to reimburse even though there was no contractual relationship between the HMO's and the emergency physicians involved.

There is no bar to a plan transferring a portion of its received premiums for an enrollee to an IPA in the form of capitation payments, and transferring responsibility for that enrollee's medical care to the IPA. But when the plan, as was alleged in this case, transfers its obligations to an IPA it knows, or has reason to know, will be financially unable to fulfill its obligations, the result is that the emergency physicians will be forced (by statute) to continue providing emergency services to the IPA's enrollees, with no possibility of receiving their (statutorily-mandated) reimbursement.

We cannot sanction such a result. " 'The prompt and appropriate reimbursement of emergency providers ensures the continued financial viability of California's health care delivery system.' " (*Bell v. Blue Cross of California, supra,* 131 Cal.App.4th at p. 218.) The burden of providing services to the poor cannot be accomplished at the expense of one particular group of people. (*Cunningham v. Superior Court* (1986) 177 Cal.App.3d 336, 348 [court's attempt to compel an attorney to work pro bono denies attorney equal protection of the law].) Forcing emergency physicians to work for free would be unconscionable. (*Bell v. Blue Cross of California, supra,* 131 Cal.App.4th at p. 220.)

HMO's which would shirk their statutory obligation to reimburse emergency physicians by delegating that obligation to an IPA they know or have reason to know is

33

financially unable to meet that obligation would, in effect, have the emergency physicians treat their enrollees for free. This is morally blameworthy.[31]

### f. *Future Harm Would Be Prevented by Imposing Liability for Negligent Delegation*

The sixth factor is the policy of preventing future harm. Imposing a duty on HMO's to not delegate their reimbursement duty to IPA's they know, or have reason to know, are financially unsound would protect emergency physicians from future economic harm they cannot otherwise avoid.

### g. *No Undue Burden Would Be Imposed on HMO's*

In addition to the original six *Biakanja* factors, we also consider policy issues, such as whether extending liability would impose an undue burden on the defendants' profession. We do not believe that imposing liability for negligent delegation would impose an undue burden on HMO's. Initially, an HMO liable for negligent delegation would only be forced to reimburse the physicians the amount for which the HMO would have been statutorily-liable to pay had the HMO made no delegation of that obligation. In other words, the obligation to reimburse emergency physicians was originally imposed on the HMO; we are simply holding that if the HMO intends to delegate that

---

[31] As already noted (see fn. 30, *ante*), the HMO's have emphasized the fact that the initial delegations to the IPA's *predated* the Supreme Court's *Prospect* decision. They argue that, it was therefore understood, at the time, that the emergency physicians would not be working without compensation, as they could balance bill their patients. While it is possible that, at the time of the initial delegations, the HMO's believed that the emergency physicians could seek reimbursement by the means of balance billing their patients, we fail to see how passing the costs of emergency treatment from the HMO's (who have a statutory duty to pay for it) to the HMO's own enrollees, is any less blameworthy.

responsibility to another, it must delegate it to an entity which it reasonably believes can meet it. If the HMO cannot delegate non-negligently, it should not delegate at all. If it does, it should do so at its own risk and not place that burden on the non-contracting emergency physicians who are legally unable to protect themselves.[32]

Moreover, as a practical matter, liability for negligent delegation will not impose additional burdens on HMO's to research the financial status of their delegatee IPA's. As we have discussed, HMO's are already required to prove their own financial soundness to the Department, and part of the Department's inquiry in that regard involves a review of the HMO's contracts with its IPA's. (Health & Saf. Code, § 1375.1, subds. (b)(1) & (b)(3).) Thus, an HMO should already be well aware of the financial soundness of the IPA's with which it contracts, and should avoid contracting with IPA's whose financial condition is questionable.

### h. *Conclusion on Negligent Delegation*

As each of the *Biakanja* factors weighs in favor of finding a cause of action for negligent delegation, and policy considerations weigh in favor of such a result as well, we agree with the *Ochs* court and conclude that a cause of action for negligent delegation exists in favor of emergency physicians who allege an HMO, with whom

---

[32] The HMO's argue that, if they are required to pay for the emergency services when they have delegated that responsibility to the IPA, they will be paying for the services twice – once by means of the capitated payments to the IPA, and again by paying the emergency physicians. But the HMO can avoid such risk by the simple expedient of *not* choosing to delegate its obligations to an IPA it knows or has reason to know is unable to meet those obligations. Put another way, the HMO can, by its actions, avoid such a loss whereas the emergency physicians cannot.

they have no contractual relationship, negligently delegated its Health and Safety Code section 1371.4 duty to an IPA it knew or had reason to know was financially unsound.

Our conclusion is not barred by Health and Safety Code section 1371.4, subdivision (e).[33] We agree that HMO's are permitted to delegate their reimbursement duty to IPA's, and an emergency physician, as a general rule, has no recourse against the HMO if the IPA fails to meet its obligation. However, when the HMO is alleged to have negligently delegated the obligation, the emergency physician has a cause of action.[34]

---

[33] The HMO's argue that Health and Safety Code section 1371.4 provides a safe harbor for delegation, and any delegation, including a negligent one, is not actionable. We disagree. Health and Safety Code section 1371.4, subdivision (e) is not an immunity statute; it does not expressly provide that no causes of action may be brought for an improper delegation. (Cf. *Gentry v. eBay, Inc.* (2002) 99 Cal.App.4th 816, 828, on which the HMO's rely, which considered a federal statute expressly providing that no liability may be imposed under any inconsistent state law.) Health and Safety Code section 1371.4 simply provides that an HMO may delegate the responsibilities; it does not provide that there is immunity for an act of delegation in violation of a duty owed to third parties. As explained in *Ochs*, Health and Safety Code section 1371.4 provides immunity *unless a duty is otherwise established*. (*Ochs, supra,* 115 Cal.App.4th at p. 794.) The HMO's argument is akin to suggesting that a driver's license provides the driver immunity for negligently operating a vehicle or a handgun permit provides the gun owner immunity for negligently storing or discharging the firearm. That Health and Safety Code section 1371.4, subdivision (e) provides the HMO's with permission to delegate their statutory duties does not immunize the HMO's for doing so negligently.

[34] The distinction is significant. The Knox-Keene Act provides that "[a] plan, any entity contracting with a plan, and providers are each responsible for their own acts or omissions, and are not liable for the acts or omissions of, or the costs of defending, others. Any provision to the contrary in a contract with providers is void and unenforceable. Nothing in this section shall preclude a finding of liability on the part of a plan, any entity contracting with a plan, or a provider, based on the doctrines of equitable indemnity, comparative negligence, contribution, or other statutory or common law bases for liability." (Health & Saf. Code, § 1371.25.) This provision means that there is no vicarious liability for another entity's acts or omissions, but,

### i.	*The Result Is Different for Non-Emergency Services*

We emphasize again that our conclusion applies only to non-contracting physicians who have provided emergency services, as mandated by statute, to patients enrolled in the IPA and HMO.  The *Biakanja*  factors compel a different result with respect to non-emergency services.  Consider the non-emergency services provided by the radiology plaintiff.  The radiology physicians seeks reimbursement for services provided on a non-emergency basis, which they were *contractually* required to provide by their hospital employer.  As already noted, we recognize that the first *Biakanja* factor—whether the transaction was intended to affect the plaintiff—is, as a general rule, not satisfied when the defendant's conduct was intended to affect a class of persons to which the plaintiff belongs, rather than the particular plaintiff.  However, the element can be satisfied when the defendant owes a *statutory duty* to the class in which the plaintiff is a member, and the alleged negligence relates to the satisfaction (in this case, the delegation) of that duty.  Here, when considering non-emergency radiological services, the HMO's have no statutory duty to reimburse the radiology plaintiff for such services.  Thus, the normal formulation of the rule applies, and the radiology physicians cannot show that the HMO's delegation of the reimbursement obligation was intended to affect them.  The first *Biakanja* factor could not be satisfied by the radiology plaintiff with respect to non-emergency services.

---

instead, each entity is liable for its own acts and omissions.  (*Watanabe v. California Physicians' Service, supra,* 169 Cal.App.4th at p. 64.)  We do not hold that the HMO's are liable for their IPA's failure to pay; that would be improper vicarious liability.  We hold, instead, that the HMO's are liable for their own negligence in delegating to IPA's which they knew, or had reason to know, would be unable to pay.

The analysis of the fifth *Biakanja* factor – the moral blame attaching to defendants' conduct – also does not support the radiology physicians' claim for reimbursement for non-emergency services. The radiology physicians are not compelled by any statute to provide non-emergency treatment to enrollees in a financially unsound IPA; if they are required to do so by contract with their hospital, entry into that contract was their choice. While there is moral blame attached to HMO's who would shirk their obligation to compensate emergency physicians and thereby force emergency physicians to work for free, due to their statutory obligations, no such blame attaches to HMO's when the radiologists may be forced to perform non-emergency services for free due to the radiologists' own *contractual* obligation to do so. They have voluntarily accepted the risk of non-payment for their services.

Finally, we are concerned with the burden which would be placed on the HMO's if we found a duty running to the radiology physicians to not delegate to a financially unsound IPA. While the radiology physicians had no contract with the HMO's or IPA, and thus are admittedly not a preferred provider of the HMO's or IPA, they are seeking compensation for services provided in a non-emergency context which they were contractually committed to perform. There is no statutory duty compelling them to provide such services and, as far as the HMO's and IPA are concerned, those services are provided *as volunteers*.[35] If a physician chooses to contract with an IPA, the physician has effectively chosen to accept the risk of that IPA's failure. When

---

[35]  The HMO's and IPA may have a contractual duty to their enrollees to partially compensate the non-preferred provider radiologists, but this is not alleged as a basis for the radiology physicians to recover in this case.

a physician chooses to voluntarily provide services to an IPA enrollee, the result should be the same. If we find a duty in either of such circumstances, physicians would be encouraged to provide *non-emergency* services to patients when the physicians have no contractual relationship with the HMO or IPA, which could undermine the entire HMO system as we know it.

4.     *The HMO's Duty Not To Negligently Delegate Is A Continuing One*

As the physicians have alleged that the HMO's were negligent in their initial delegation decision, and we have concluded a cause of action exists for negligent delegation, the HMO's demurrers should not have been sustained. However, as the parties have briefed the issue, we also discuss whether the duty of the HMO's is a continuing one.

Preliminarily, we note the difficulty in determining at this stage of the litigation, as a matter of law, the difference between a negligent delegation and a negligent failure to de-delegate. If, for example, a plan's contract with an IPA was renewed annually, is each renewal to be considered a new delegation? When an HMO adds a new enrollee, and that enrollee's risk is assigned to the IPA, is the delegation of the obligation to pay reimbursement for services rendered to *that enrollee* a new delegation? When an emergency physician treats a patient, is the obligation to pay for that particular treatment newly delegated at the time the obligation arises? The record before us does not include any of the delegation contracts, and we therefore cannot determine whether any particular decision occurring after the initial contract between the HMO and the

39

IPA is a new delegation or simply a failure to reassume the delegated obligation or to "de-delegate."

In any event, it is clear to this court that the factors which compel us to find a cause of action for negligent delegation also mandate our conclusion that the duty to not delegate to an IPA which the HMO knows, or has reason to know, to be financially unsound is a continuing one, and a cause of action therefore exists for the failure to promptly reassume the obligation when an HMO knows or has reason to know that the IPA to which it has made an initial delegation is now financially unable to meet the delegated duty.[36]

Consideration of the seven factors discussed above, when the HMO is alleged to have known or had reason to know that the IPA is financially unsound and is not, in fact, fulfilling its duty to reimburse emergency physicians, is largely the same: (1) the transaction is still intended to affect the emergency physicians; (2) the foreseeability of harm, if the IPA has already begun to fail to perform, is even stronger; (3) the emergency physicians will clearly have suffered injury; (4) the closeness of the

---

[36]    We are not suggesting that the HMO has a duty to "de-delegate" the IPA in its entirety.  We are simply holding that, when the HMO knows or has reason to know that its IPA cannot meet its financial obligation of reimbursing emergency physicians, the HMO must reassume that obligation to reimburse the emergency physicians.  We emphasize that the applicable regulations *require* an HMO's contract with its IPA to include a term "authorizing the plan to assume responsibility for the processing and timely reimbursement of provider claims in the event that the [IPA] fails to timely and accurately reimburse its claims."  (Cal. Code Regs., tit. 28, § 1300.71, subd. (e)(6).)  We are holding that, under appropriate circumstances, the HMO may be required to exercise this provision, with respect to emergency physician reimbursement.  The IPA would continue to have the responsibility to provide all non-emergency services to its enrollees.

connection between the failure to reassume the obligation to pay and the injury is the same; (5) the moral blame attaching to the HMO's conduct is the same or greater;[37] (6) the policy of preventing future harm is the same; and (7) no additional burden is imposed on the HMO's, as the statutes and regulations require the IPA's to regularly report on their financial condition and claims payment performance to the HMO's. (Health & Saf. Code, § 1375.4, subd. (a)(1); Cal. Code Regs., tit. 28, § 1300.71, subd. (e)(3).) As the factors are the same, the result is the same, and plaintiffs may pursue a cause of action for negligent failure to reassume this previously delegated obligation.[38]

---

[37] In the instant case, the plaintiffs allege that, as they were unpaid by La Vida, they sought help from the HMO's, whose response was for them to continue submitting their bills to La Vida. If true, this reflects a certain degree of callousness; it appears that the HMO's were content to leave the plaintiffs between the Scylla of the statutes requiring them to provide emergency treatment and the Charybdis of an IPA which it knew or had reason to know would never pay for such treatment.

[38] As we discussed above, the Supreme Court in *Prospect* explicitly stated that it was not considering the issue of whether balance billing was appropriate in cases in which the HMO/IPA was unable to pay. (*Prospect, supra,* 45 Cal.4th at p. 507, fn. 5.) Based on language in the opinion, we have expressed the view that, if such issue were presented, the Supreme Court would, nonetheless, ultimately conclude that balance billing is inappropriate in cases in which the IPA, but not the HMO, is unable to pay. If, however, the Supreme Court takes a different position, and concludes that balance billing is acceptable when the IPA is unable to pay, the result would surely be that emergency physicians would balance bill their patients when the IPA cannot pay, and the patients would then resubmit the bills to their HMO's for payment pursuant to their contracts with their HMO's (which include coverage for emergency services). In short, the end result would be the same as the result we reach here: when the IPA (but not the HMO) is financially unsound, the HMO would ultimately be responsible to compensate the emergency physicians. Our result, which allows the emergency physicians to seek their remedy directly from the HMO, is consistent with the principles which motivated the *Prospect* decision, as it would eliminate the patient as an intermediary in the billing dispute.

5.      *The Abstention Defense is Inapplicable*

Before the trial court, the HMO's argued that the doctrine of abstention should apply to the cause of action for unfair competition. On appeal, the HMO's extend this argument to all causes of action, arguing that the courts should abstain from resolving even a dispute over the existence of a negligence cause of action.

There are various theories underlying the application of judicial abstention. "Courts may abstain when the lawsuit involves determining complex economic policy, which is best handled by the Legislature or an administrative agency. [Citation.]" (*Alvarado v. Selma Convalescent Hospital* (2007) 153 Cal.App.4th 1292, 1298.) Abstention may also be appropriate "when granting the requested relief would require a trial court to assume the functions of an administrative agency, or to interfere with the functions of an administrative agency." (*Ibid.*) However, judicial abstention applies only in cases of equity. (*Shuts v. Covenant Holdco LLC* (2012) 208 Cal.App.4th 609, 625; *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1362.) As the bulk of plaintiffs' complaint sounds in negligence and seeks damages, judicial abstention is simply not applicable. In any event, this is not an appropriate case for abstention. We do not here involve the courts in complex issues of economic or health care policy, nor do we interfere with the administrative jurisdiction of the Department. We simply

42

conclude that when an HMO negligently delegates its statutory duty to reimburse

emergency physicians to an IPA it knows or has reason to know is unable to fulfill that

duty, or negligently continues its delegation once it knows or has reason to know that

the IPA is unable to do so, the HMO may be liable to the emergency physicians.[39]

---

[39]    As we reverse the judgment on the basis that plaintiffs have properly pleaded a cause of action for negligent delegation (and/or could state a cause of action for failure to reassume the delegated obligation), we discuss the other causes of action pleaded by plaintiffs (which all seek *compensatory* relief for the violation of the same primary right of plaintiffs – their right to be paid for services). We note, however, that plaintiffs' cause of action for unfair competition (Bus. & Prof. Code, § 17200), appears to seek damages, not restitution, and would therefore fail. (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 371.)

## *DISPOSITION*

The judgment is reversed, and the matter remanded to the trial court with directions to conduct further proceedings consistent with this opinion. The plaintiffs shall recover their costs on appeal.


***CERTIFIED FOR PUBLICATION***


CROSKEY, J.

WE CONCUR:


KLEIN, P. J.


ALDRICH, J.